## IN RE ROBERT C. FLANAGAN
### (15419)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

Argued December 11, 1996—officially released March 18, 1997

*Roger J. Frechette,* with whom was *Matthew E. Frechette,* for the appellant (respondent).

*Gregory T. D'Auria,* assistant attorney general, with whom were *Susan Quinn Cobb,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Carolyn K. Querijero,* assistant attorney general, for the appellee (judicial review council).

*Opinion*

CALLAHAN, C. J. Former Superior Court Judge Robert C. Flanagan appeals from the decision of the judicial review council (review council) to censure him publicly for engaging in a consensual sexual relationship with a married court reporter who regularly had been assigned to his courtroom over the course of their relationship.[1] Pursuant to General Statutes § 51-51n (a) (1),[2] the review council is authorized to censure a judge

[1] Although public censure was the only sanction imposed by the review council and therefore the only sanction that we review, we note that the Governor did not renominate Flanagan to serve as a Superior Court judge when his eight year term expired on March 8, 1996, during the pendency of the review council's consideration of the case.

[2] General Statutes § 51-51n provides: "Authority of council. (a) The Judicial Review Council may, after a hearing pursuant to subsection (c) of section 51-51*l*, (1) publicly censure the judge, compensation commissioner or family support magistrate, (2) suspend the judge, compensation commissioner or family support magistrate for a definite term not to exceed one year, (3) refer the matter to the Supreme Court with a recommendation that the judge or family support magistrate be suspended for a period longer than one year, (4) refer the matter to the Supreme Court with a recommendation that the judge or family support magistrate be removed from office or to the Governor with a recommendation that the compensation commissioner be removed from office or (5) exonerate the judge, compensation commissioner or family support magistrate of all charges.

"(b) If public censure is recommended, the chairman shall prepare and forward the censure in writing to the judge, compensation commissioner or family support magistrate being censured, the Chief Justice, the Chief Court Administrator and the joint standing committee on judiciary, at least ten days prior to the publication of the censure. The censure shall be a

of the Superior Court publicly for a "wilful violation of . . . any canon of judicial ethics . . . ," as set forth in General Statutes § 51-51i (a) (2).[3] The review council concluded, after a public hearing, that Flanagan's conduct had violated canons 1 and 2A of the canons of the Code of Judicial Conduct.[4]

The review council's investigation into Flanagan's conduct pursuant to General Statutes § 51-51*l* (a)[5] was

public record as defined in section 1-19. An appeal from the decision of the council for public censure shall automatically stay the publication of the censure.

"(c) If the council exonerates a judge, compensation commissioner or family support magistrate, a copy of the proceedings and report of the council shall be furnished to the judge, compensation commissioner or family support magistrate."

[3] General Statutes § 51-51i provides in relevant part: "Grounds for removal, suspension and censure. (a) In addition to removal by impeachment and removal by the Governor on the address of two-thirds of each house of the General Assembly as provided in the Connecticut constitution, a judge shall be subject, in the manner and under the procedures provided in this chapter to censure, suspension or removal from office for (1) conduct prejudicial to the impartial and effective administration of justice which brings the judicial office in disrepute, (2) wilful violation of section 51-39a or any canon of judicial ethics, (3) wilful and persistent failure to perform his duty, (4) neglectful or incompetent performance of his duties, (5) final conviction of a felony or of a misdemeanor involving moral turpitude, (6) disbarment or suspension as an attorney-at-law, (7) wilful failure to file a financial statement or the filing of a fraudulent financial statement required under section 51-46a, or (8) temperament which adversely affects the orderly carriage of justice. . . ."

[4] Canon 1 of the Code of Judicial Conduct provides: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 2A of the Code of Judicial Conduct provides: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

[5] General Statutes § 51-51*l* provides in relevant part: "(a) Except as provided in subsection (d), the Judicial Review Council shall investigate every written complaint brought before it alleging conduct under section 51-51i, and may initiate an investigation of any judge, compensation commissioner or family support magistrate if (1) the council has reason to believe conduct

precipitated by a written complaint filed by Penny Ross, a court reporter. In her written complaint, Ross alleged that "[t]here was sex between [herself] and Judge Flanagan on countless occasions over the past four years." The bulk of Ross' written complaint alleged a course

under section 51-51i has occurred or (2) previous complaints indicate a pattern of behavior which would lead to a reasonable belief that conduct under section 51-51i has occurred. The council shall, not later than five days after such initiation of an investigation or receipt of such complaint, notify by registered or certified mail any judge, compensation commissioner or family support magistrate under investigation or against whom such complaint is filed. A copy of any such complaint shall accompany such notice. The council shall also notify the complainant of its receipt of such complaint not later than five days thereafter. Any investigation to determine whether or not there is probable cause that conduct under section 51-51i has occurred shall be confidential and any individual called by the council for the purpose of providing information shall not disclose his knowledge of such investigation to a third party prior to the decision of the council on whether probable cause exists, unless the respondent requests that such investigation and disclosure be open, provided information known or obtained independently of any such investigation shall not be confidential. The judge, compensation commissioner or family support magistrate shall have the right to appear and be heard and to offer any information which may tend to clear him of probable cause to believe he is guilty of conduct under section 51-51i. The judge, compensation commissioner or family support magistrate shall also have the right to be represented by legal counsel and examine and cross-examine witnesses. . . .

"(b) The council shall, not later than three business days after the termination of such investigation, notify the complainant, if any, and the judge, compensation commissioner or family support magistrate that the investigation has been terminated and the results thereof. If the council finds that conduct under section 51-51i has not occurred, but the judge, compensation commissioner or family support magistrate has acted in a manner which gives the appearance of impropriety or constitutes an unfavorable judicial or magisterial practice, the council may issue an admonishment to the judge, compensation commissioner or family support magistrate recommending a change in judicial or magisterial conduct or practice. If an admonishment is issued, the council shall inform the complainant, if any, that an admonishment was issued, provided the admonishment is the result of misconduct alleged in the complaint and the substance of the admonishment shall not be disclosed.

"(c) If a preliminary investigation indicates that probable cause exists that the judge, compensation commissioner or family support magistrate is guilty of conduct under section 51-51i, the council shall hold a hearing concerning the conduct or complaint. All hearings held pursuant to this

of conduct by Flanagan that she claimed had caused her repeatedly to engage in coerced sexual relations with him during their relationship.

After the probable cause proceedings at which Ross, Flanagan and several other witnesses testified, the review council charged Flanagan with having violated canons 1 and 2A of the Code of Judicial Conduct and § 51-51i (a) (2) by "engag[ing] in a *consensual* sexual relationship with a married court employee . . . ."[6]

subsection shall be open. A judge, compensation commissioner or family support magistrate appearing before such a hearing shall be entitled to counsel, to present evidence and to cross-examine witnesses. The council shall make a record of all proceedings pursuant to this subsection. The council shall not later than fifteen days after the close of such hearing publish its findings together with a memorandum of its reasons therefor.

"(d) No complaint against a judge, compensation commissioner or family support magistrate alleging conduct under section 51-51i shall be brought under this section but within one year from the date the alleged conduct occurred or was discovered or in the exercise of reasonable care should have been discovered, except that no such complaint may be brought more than three years from the date the alleged conduct occurred.

"(e) Notwithstanding the provisions of subsections (a) and (b) of this section, the council shall disclose any information concerning complaints received by the council on and after January 1, 1978, investigations, and disposition of such complaints to the legislative program review and investigations committee when requested by the committee in the course of its functions, in writing and upon a majority vote of the committee, provided no names or other identifying information shall be disclosed.

"(f) On and after December 19, 1991, any judge, compensation commissioner or family support magistrate who has been the subject of an investigation by the Judicial Review Council as a result of a complaint brought before such council may request that such complaint, investigation and the disposition of such complaint be open to public inspection."

[6] The two formal charges brought against Flanagan are as follows:

"1. Between March 1, 1992, and October 30, 1995, the Honorable Robert C. Flanagan engaged in a consensual sexual relationship with a married court employee, which conduct resulted in his failure to observe high standards of conduct so that the integrity and independence of the judiciary might be preserved, in violation of Canon 1 of the Code of Judicial Conduct and Section 51-51i (a) (2) of the Connecticut General Statutes.

"2. Between March 1, 1992, and October 30, 1995, the Honorable Robert C. Flanagan engaged in a consensual sexual relationship with a married court employee, which conduct resulted in his failure to act at all times in a manner that promotes public confidence in the integrity and impartiality

(Emphasis added.) The review council did not find probable cause to believe that Ross' relationship with Flanagan had been coerced in any way. Implicit in the review council's decision to charge Flanagan for ethical violations based solely on a consensual sexual relationship with a married court employee was the council's rejection of the substance of Ross' written complaint and her testimony at the probable cause hearing concerning coercion. The review council's rejection of Ross' coercion charges finds overwhelming support in the record in that Ross' written complaint and oral testimony were inconsistent and not credible. On cross-examination at the probable cause hearing, Ross admitted to several incidents that would indicate that her relationship with Flanagan had been consensual. Moreover, every other witness at the probable cause hearing testified to facts that left little doubt that the relationship had been consensual. Furthermore, none of the witnesses testified to a belief that Flanagan had coerced Ross to engage in a sexual relationship with him at any time. Finally, Flanagan himself admitted that he had had a sexual relationship with Ross for almost four years but testified that it had been entirely consensual.

After a public hearing conducted pursuant to General Statutes § 51-51*l* (c), at which only Ross, Moira Butler and Shepard Sherwood[7] testified, the review council made ten findings of fact. Those findings were as follows: "(1) [Flanagan] was, at all relevant times, an active judge of the Connecticut Superior Court. (2) [Ross], at all relevant times, was a court reporter employed by the State Judicial Branch. (3) [Ross], at all relevant times, was a married woman. (4) [Flanagan] engaged

of the judiciary, in violation of Canon 2A of the Code of Judicial Conduct and Section 51-51i (a) (2) of the Connecticut General Statutes."

[7] Moira Butler is the affirmative action coordinator for the Judicial Branch. Shepard Sherwood was an assistant public defender assigned to the Superior Court in geographical area number six in New Haven.

in a consensual sexual relationship with [Ross] from March 1992, to October 1995. (5) For substantial periods of time during this relationship, [Ross] was consistently assigned as a court reporter to the courtroom in G.A. 6, New Haven, over which [Flanagan] presided. (6) On many occasions [Ross] was present in the chambers of [Flanagan] before the opening of court, during pretrial conferences with counsel present, and during recesses. (7) From early January 1995 to the fall of 1995, [Ross] also had a sexual relationship with Attorney Shepard Sherwood. (8) Attorney Sherwood was, at all relevant times, an assistant public defender at G.A. 6, New Haven, and weekly, and sometimes more often, appeared before [Flanagan] for pretrials in his chambers and other matters in court in the presence of [Ross] as the assigned court reporter. (9) The expert opinion evidence offered by [Flanagan] was not persuasive. (10) [Flanagan] willfully engaged in the conduct alleged." On the basis of those findings, the review council, by a nine to three vote, recommended a public censure of Flanagan on the grounds that, by engaging in a long-term consensual sexual relationship with his court reporter, he had violated canons 1 and 2A of the Code of Judicial Conduct. This appeal followed.

Flanagan claims that the review council improperly: (1) charged him with consensual sexual misconduct on the basis of evidence adduced at the probable cause hearing even though Ross' written complaint had been limited to forced or coerced sexual misconduct; (2) concluded that he had violated canons 1 and 2A without any expert testimony to support that conclusion; (3) concluded that he had engaged in a "wilful" violation of canons 1 and 2A in the absence of evidence that he had the specific intent to violate those canons; (4) failed to dismiss the proceedings against him in light of Ross' violation of the confidentiality provision of § 51-51*l* (a); (5) considered evidence beyond the scope of the

charges against him at the formal hearing; and (6) concluded, as a matter of law, that a consensual sexual relationship with his married court reporter constituted a violation of canons 1 and 2A.

Before analyzing Flanagan's procedural and substantive claims on appeal, however, we need first to set out the appropriate standards of review for the factual findings and legal conclusions of the review council. In reviewing the factual determinations of the review council, we "must take into account the risk that unfounded charges of judicial misconduct will impair society's interest in an independent judiciary. We must therefore depart from our normal rule of deference to factfinding by trial courts and administrative agencies. We have a nondelegable responsibility, upon an appeal, to undertake a scrupulous and searching examination of the record to ascertain whether there was substantial evidence to support the council's factual findings." (Internal quotation marks omitted.) *In re Zoarski*, 227 Conn. 784, 789–90, 632 A.2d 1114 (1993); *Council on Probate Judicial Conduct re: James H. Kinsella*, 193 Conn. 180, 192, 476 A.2d 1041 (1984).

As to the review council's ultimate legal conclusion that the facts found support a finding of a violation of one or more of the canons of the Code of Judicial Conduct, we are persuaded that our review should be de novo. Pursuant to the constitution of Connecticut, article fifth, as amended by article eleven of the amendments, all judges within the state "may, in such manner as shall by law be prescribed, be removed or suspended by the supreme court." In addition to the authority it bestows upon this court, article fifth, as amended by article eleven of the amendments, also permits the General Assembly to create a judicial review council with the power to censure or to suspend any judge for a period not to exceed one year. The constitutional provisions relating to the disciplinary powers of this court

have been codified at General Statutes § 51-51j.[8] Similarly, the constitutional provisions pertaining to the powers of the review council have been codified at General Statutes § 51-51n.[9] Additionally, General Statutes § 51-51r[10] provides that any judge aggrieved by a decision of the review council may appeal that decision directly to this court. Together, the statutory and constitutional provisions make clear that this court may institute disciplinary proceedings against any judge and, after a hearing, remove or suspend any judge found guilty of a disciplinary violation. Although the review council is also empowered to review matters of judicial discipline, it may never order discipline more severe than a one year suspension. In those cases in which the review council believes that a sanction more severe than a one year suspension is appropriate, it only may recommend a disposition of the matter to this court, which has sole authority to suspend a judge for a period greater than one year or to remove a judge from office.[11] Moreover, even in those instances in which the action deemed appropriate by the review council is a one year suspension or any lesser form of discipline, this court may always review such decisions of the review council under § 51-51r.

---

[8] General Statutes § 51-51j provides in relevant part: "(a) The Supreme Court may remove or suspend any judge . . . for any period upon recommendation of the Judicial Review Council, established under section 51-51k, or on its own motion. Upon receipt of such recommendation or on its own motion, the Supreme Court shall make an investigation of the conduct complained of and hold a hearing thereon, unless such an investigation and hearing has been held by the Judicial Review Council. . . ."

[9] See footnote 2.

[10] General Statutes § 51-51r provides: "Appeals, rules. Any judge or family support magistrate aggrieved by any decision of the Judicial Review Council may appeal the decision to the supreme court in accordance with such procedure for the appeal as the Supreme Court shall adopt by rule."

[11] In addition, the legislature may, if it deems it appropriate, institute impeachment proceedings under article fifth, § 2, of the Connecticut constitution.

Because we are empowered, by the constitution as well as by § 51-51j, to determine all matters of judicial discipline in the first instance as well as upon appeal of the review council's decisions, we conclude that our review of the review council's legal conclusions is de novo. This approach promotes consistency in the enforcement of judicial discipline and finds support in the decisions of many of our sister Supreme Courts. See *In re Inquiry Concerning a Judge*, 788 P.2d 716, 722 (Alaska 1990) (Supreme Court is "entrusted with the ultimate decision in matters of judicial qualifications" and will "independently evaluate the evidence of record"); *In the Matter of McClain*, 662 N.E.2d 935, 937 (Ind. 1996) (de novo review of facts and law); *In re Jenkins*, 437 Mich. 15, 18, 22, 465 N.W.2d 317 (1991) (de novo review of law and facts, with appropriate deference to assessment of credibility by special master); *In re Miera*, 426 N.W.2d 850, 855 (Minn. 1988) (Supreme Court "makes an independent review of the record"); *In re Elliston*, 789 S.W.2d 469, 476 (Mo. 1990) ("independent review of the charges on which the Commission found guilt"); *In re Kelly*, 225 Neb. 583, 585, 407 N.W.2d 182 (1987) (de novo review on record); *In the Matter of Seaman*, 133 N.J. 67, 75, 627 A.2d 106 (1993) (de novo review to decide "whether the facts as determined demonstrate conduct on the part of the respondent that is incompatible with [the] canons"); *In the Matter of Greenfield*, 76 N.Y.2d 293, 295, 557 N.E.2d 1177, 558 N.Y.S.2d 881 (1990) (state constitution confers on Court of Appeals "plenary power to review the law and the facts as well as the sanction"); *In re Bullock*, 328 N.C. 712, 717, 403 S.E.2d 264 (1991) (Supreme Court must exercise independent judgment); *In the Matter of Disciplinary Action Against Wilson*, 461 N.W.2d 105, 107 (N.D. 1990) (de novo on record); *Cincinnati Bar Assn. v. Heitzler*, 32 Ohio St. 2d 214, 220, 291 N.E.2d 477 (1972), cert. denied, 411 U.S. 967, 93 S. Ct. 2149,

36 L. Ed. 2d 687 (1973) (Supreme Court has " 'full responsibility for determining what the facts are and what action should be taken on those facts' "); *In the Matter of Chiovero*, 524 Pa. 181, 187, 570 A.2d 57 (1990) (Supreme Court must undertake independent review of record created by judicial review and inquiry board); *In the Matter of Deming*, 108 Wash. 2d 82, 87, 736 P.2d 639 (1987) (de novo review of facts and law); *In the Matter of Hey*, 193 W. Va. 572, 577, 457 S.E.2d 509 (1995) (" 'Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings' ").[12]

---

[12] We note that at least four states have established other hybrid standards that attempt to incorporate the notion of "independent review" as well as some deference to the legal conclusions of their equivalent to our review council. See *Ryan* v. *Commission on Judicial Performance*, 45 Cal. 3d 518, 530, 754 P.2d 724, 247 Cal. Rptr. 378 (1988) ("[independent] review" but "accord great weight to the legal conclusions of the Commission"); *In re McAllister*, 646 So. 2d 173 (Fla. 1994) (" 'The findings and recommendations of the Judicial Qualifications Commission are of persuasive force and should be given great weight. However, the ultimate power and responsibility in making a determination rests with this Court.' "); *In re Hill*, 152 Vt. 548, 556, 568 A.2d 361 (1989) (Supreme Court is final arbiter but "great weight" accorded judicial conduct board's findings and conclusions); *In re Kaiser*, 111 Wash. 2d 275, 279, 759 P.2d 392 (1988) ("de novo" review on record while according "considerable weight" to findings and recommendation of commission). The California Supreme Court has recently justified its reliance on the legal conclusions of its commission on judicial performance on the basis of that commission's expertise. *Dodds* v. *Commission on Judicial Performance*, 12 Cal. 4th 163, 168, 906 P.2d 1260, 48 Cal. Rptr. 2d 106 (1996). Such a justification is inappropriate here because our review council, composed of three judges, three lawyers and six members with no legal training, has no more expertise in matters of judicial ethics than does this court. Because our constitutional and statutory scheme gives this court sole authority to impose discipline in the most serious cases and either sole authority or at least power of review in less serious cases, we conclude that deference to the review council's conclusion that certain conduct violates § 51-51i is inappropriate.

We also note that the "substantial evidence" standard articulated by this court in *In re Zoarski*, supra, 227 Conn. 789–90, and *Council on Probate Judicial Conduct re: James H. Kinsella*, supra, 193 Conn. 192, was grounded in the review council's superior position to assess credibility and thus was

We turn next to the merits of Flanagan's contentions on appeal. We are not persuaded that any of them warrants reversal of the review council's conclusions.

I

Flanagan first claims that the review council was required to dismiss the proceedings against him when it found that Ross' allegations of a forced or nonconsensual sexual relationship were not supported by probable cause. Flanagan argues that, pursuant to the due process clause of the fourteenth amendment to the United States constitution[13] and § 51-51*l*, the review council is without authority to make a finding of probable cause based upon facts that are not specifically alleged in the complaint that initiates the review council's investigation. We disagree.

To address this claim, it is necessary for us to examine the statutory and regulatory procedures governing judicial discipline and how those procedures were employed in this case. The statutory and regulatory scheme pertaining to judicial discipline divides the procedure to be followed by the review council into two discrete stages: (1) an investigatory stage, during which the review council, acting either on a formal complaint or its own motion, may hold a confidential hearing to determine whether probable cause exists to believe that a judge has engaged in misconduct; and (2) in the event that the review council determines that probable cause does exist, an adjudicatory stage in the form of a public hearing to determine whether a violation has occurred. General Statutes § 51-51*l*;[14] Regs., Conn. State Agencies § 51-51k-6.[15]

_____

intended to apply only to the review council's findings of fact. Any suggestion in those opinions that we will accord a similar modicum of deference to the review council's conclusions of law is disapproved.

[13] Flanagan raises no independent state constitutional argument.

[14] See footnote 5.

[15] Section 51-51k-6 of the Regulations of Connecticut State Agencies provides: "Procedure on complaints

In this case, the proceedings before the review council, as dictated by the statutes and regulations, were divided into those distinct investigatory and adjudicatory stages. The investigation into Flanagan's conduct was instigated by a written complaint from Ross alleging that Flanagan had coerced her into having sexual relations with him on various occasions for a period of more than three and one-half years.[16] Upon receipt of Ross' complaint, the review council provided a copy thereof to Flanagan and notified him of its intent to hold a confidential investigatory hearing to determine whether probable cause existed to believe that he had engaged in conduct that would constitute a violation of one or more of the canons of the Code of Judicial Conduct. The notice provided that "[t]he area of inquiry by the council will be whether the conduct alleged in the complaint occurred, and, if it did, whether such conduct violated Canons 1, 2A or 2B of the Code of Judicial Conduct in violation of Section 51-51i (a) of the Connecticut General Statutes." In accordance with § 51-51*l* (a),[17] Flanagan was also notified that he had the right to attend the probable cause hearing, to be

"The procedure on a complaint shall be an investigation to determine whether probable cause, to believe that the person being investigated is guilty of conduct set forth in section 51-51i of the General Statutes, exists, and an open hearing if such probable cause is found to exist."

[16] The review council points out that, in one statement in her complaint, Ross simply alleged that "[t]here was sex between [herself] and Judge Flanagan on countless occasions over the past four years." The review council argues, on the basis of this statement in isolation, that the initial complaint "did not . . . allege only rape and forced sex." We disagree. The above statement is preceded in the same paragraph by allegations that Flanagan followed her, and succeeded in the same paragraph by allegations that Flanagan "demanded" that she have sexual intercourse with him and that he had become increasingly "threatening" toward her. The rest of the statement similarly is replete with allegations of threats and coercion. When read as a whole, it is clear that the gravamen of the initial complaint was that Flanagan had coerced Ross to have a sexual relationship with him for four years.

[17] See footnote 5.

represented by counsel, to testify, to present evidence and to examine and cross-examine witnesses. Pursuant to § 51-51k-5 of the Regulations of Connecticut State Agencies, Flanagan filed a written response with the review council.[18] This response stated: "I deny the material allegations of the complaint as formulated by Ms. Penny Ross as set forth in her statement to Ms. Moira Butler."

Flanagan elected to appear at the hearing with counsel, to cross-examine the witnesses presented by the executive director and to present his own witnesses and testify on his own behalf. In his testimony, Flanagan admitted that he had had a consensual sexual relationship with Ross for approximately three and one-half years and that she had been assigned to his courtroom for much of that time. Flanagan denied that he had made any threats or that he had abused his position of authority in any way. After the probable cause hearing, the review council formally charged Flanagan with two counts of misconduct alleging that Flanagan's "consensual sexual relationship with a married court employee" had violated canons 1 and 2A of the Code of Judicial Conduct.

In response to the review council's issuance of formal charges, Flanagan's counsel sent a letter to the executive director of the review council stating that it was Flanagan's position that, by issuing charges on grounds not specifically alleged in Ross' complaint, the review council had initiated a new "investigation" and that Flanagan was entitled to a new probable cause hearing based on that conduct rather than proceeding immediately to the formal hearing stage. After stating that position, however, Flanagan's counsel wrote: "Never-

---

[18] Section 51-51k-5 of the Regulations of Connecticut State Agencies provides in relevant part: "The judge . . . may, within twenty days after receipt of the notice of the complaint . . . send a written reply to the complaint to the Council. . . ."

theless, we want to and will treat the hearing as a formal hearing."[19] Flanagan also filed an answer to the review council's charges in which he responded to both counts of the charging document by admitting that he had "engaged in a consensual sexual relationship with a married court employee" but denying that such conduct constituted a violation of either canon 1 or 2A.

Flanagan now argues, for the first time, that, "[h]aving found that [he] did not violate the code under the conduct alleged [in the initial citizen complaint]—rape and forced sex—the [review council] was legally obliged to dismiss the complaint for lack of probable cause." Flanagan claims that the United States Supreme Court's decision in *In re Ruffalo*, 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117, modified on other grounds, 392 U.S. 919, 88 S. Ct. 2257, 20 L. Ed. 2d 1380 (1968), is dispositive of this claim. We reject this argument on two alternate grounds: (1) Flanagan explicitly waived the claim in his letter to the executive director of the review council; and (2) even in the absence of waiver, *Ruffalo* does not require that a judge be given notice, during the *investigatory* stage of the proceedings against him, of each of the precise charges upon which he may be sanctioned.

---

[19] The letter from Flanagan's attorney to the executive director of the review council provided in relevant part: "The investigation of Judge Flanagan was based on the written complaint brought by Ms. Ross. The [review council] did not find probable cause as to the allegations of forced sex/rape contained in the complaint. The investigation which took place on February 15, 16 and 21 was not initiated by the [review council], but, rather, was initiated by the written complaint of Ms. Ross.

"Therefore, when the Council issued its 'probable cause/consenting sex' comment, it was initiating a *new* investigation.

"Whereas a formal hearing has been set for [April 16, 1996], this hearing should properly be a probable cause hearing on the new and different investigation initiated by the [review council], namely the investigation of consenting sex. Nevertheless, we want to and will treat the hearing as a formal hearing.

"My reason for sending this letter is that it seems to me reasonable that, pursuant to [General Statutes] § 51-51q (a), the [review council] recommend the nomination of the Honorable Robert C. Flanagan for reappointment.

"May I have your thoughts?" (Emphasis in original.)

As noted previously, Flanagan's counsel sent a letter to the executive director of the review council in which he claimed that the procedure afforded by the council in finding probable cause on conduct not specifically alleged in the initial complaint by Ross may have been constitutionally suspect. In that letter, however, his counsel explicitly waived any claim on that basis by stating that Flanagan wanted to and would proceed to the formal hearing stage. Flanagan's counsel never again made any claim of lack of notice until his brief to this court. Because of this explicit waiver, we are not bound to consider the merits of Flanagan's notice claim. Practice Book § 4061.

Moreover, even if we were to address Flanagan's claim under *Ruffalo*, we are not persuaded that he could prevail. Ruffalo had been an active trial lawyer who was counsel in many actions against railroad companies under the Federal Employers' Liability Act. *In re Ruffalo*, supra, 390 U.S. 546. After an investigation into Ruffalo's handling of those cases, the Association of American Railroads made several charges of impropriety to the local bar association. Id. The Ohio board of commissioners on grievances and discipline (Ohio board) subsequently filed formal charges against Ruffalo. Id. The Ohio board charged Ruffalo with twelve counts of misconduct, two of which accused Ruffalo of soliciting clients through an agent, Michael Orlando. Id. At the formal hearings on the charges, both Ruffalo and Orlando testified that Orlando had not solicited clients but that he had merely investigated certain complaints, some of which involved Orlando's employer, the Baltimore & Ohio Railroad. Id. After hearing that testimony, the Ohio board added a thirteenth count of misconduct to its charge against Ruffalo based upon his hiring of Orlando to investigate Orlando's employer. Id. A motion to strike the additional count was denied, and Ruffalo was given an extended continuance in order

to respond to the new charge against him. Id., 547. After the continuance, no new evidence pertaining to the thirteenth count was introduced and the Ohio board sustained the charge contained in that count, as did the Ohio Supreme Court upon review. Id. Ruffalo was ordered disbarred in the state courts of Ohio. Id.

On the basis of the record and findings of the Ohio Supreme Court, the Sixth Circuit Court of Appeals subsequently disbarred Ruffalo from practice in that court on the grounds charged in the thirteenth count by the Ohio board. *In re Ruffalo*, 370 F.2d 447 (6th Cir. 1966). The United States Supreme Court granted certiorari to review the Sixth Circuit disbarment. *In re Ruffalo*, 389 U.S. 815, 88 S. Ct. 30, 19 L. Ed. 2d 66 (1967).

The United States Supreme Court examined the procedure afforded Ruffalo in the state courts because, in determining whether disbarment by a state should be followed by disbarment on the same grounds in a federal court, the federal court must consider whether " 'the state procedure from want of notice or opportunity to be heard was wanting in due process.' " *In re Ruffalo*, supra, 390 U.S. 550, quoting *Selling* v. *Radford*, 243 U.S. 46, 51, 37 S. Ct. 377, 61 L. Ed. 585 (1917). The court concluded that, because attorney discipline proceedings are quasi-criminal in nature, an attorney is entitled by due process to reasonable notice of the charges against him "before *the proceedings* commence." (Emphasis added.) *In re Ruffalo*, supra, 390 U.S. 551. The court reasoned that the proceedings could "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused." Id., 551.

Since *Ruffalo*, we have affirmed that an attorney subject to disciplinary proceedings must be given reasonable notice of the charges against him or her "before *the proceedings* commence"; (emphasis added) *Statewide*

*Grievance Committee* v. *Botwick*, 226 Conn. 299, 308, 627 A.2d 901 (1993); and that this rule applies with equal force to judicial discipline proceedings. *Council on Probate Judicial Conduct re: James H. Kinsella*, supra, 193 Conn. 207. We conclude, however, that, under *Ruffalo*, "the proceedings" in advance of which reasonable notice must be given in judicial discipline proceedings are not the probable cause proceedings because those proceedings are investigatory, rather than adjudicatory, in nature.

We are guided by our decision in *Statewide Grievance Committee* v. *Presnick*, 215 Conn. 162, 168–70, 575 A.2d 210 (1990), in which we addressed a procedural due process claim in the context of attorney disciplinary proceedings and distinguished between the different process due at the investigatory and adjudicatory stages of such proceedings. Presnick had appealed a decision of the Superior Court suspending him from the practice of law for a period of one year. Id., 163. He claimed, inter alia, that he had been denied due process of law because, at the stages preceding his formal presentment to the Superior Court, he had not been given the opportunity to cross-examine witnesses or to present his own testimony. Id., 168. We rejected Presnick's due process claim because the stages of the disciplinary process at which the alleged procedural defects occurred "served only as a predicate to a decision to file a presentment against the defendant in the Superior Court. The presentment that followed permitted the defendant a hearing in Superior Court according to the customary rules of evidence, and at which time he had the right to be present, to be represented by counsel if he chose, to cross-examine witnesses and to present evidence in his own behalf." Id., 170. We concluded that the process given to Presnick, "when viewed in its totality, was adequate to meet the procedural safeguards required by the federal and state constitutions." Id.

We conclude that the due process protections afforded in disciplinary proceedings by *Ruffalo* and its progeny are inapplicable unless and until the review council brings formal charges akin to the presentment to the Superior Court in attorney discipline proceedings. "Simply stated, a judge does not have the [constitutional] right to defend against a proceeding that has not yet been brought." *Ryan* v. *Commission on Judicial Performance*, 45 Cal. 3d 518, 528, 754 P.2d 724, 247 Cal. Rptr. 378 (1988).

Several other courts have drawn the distinction between the process due at the investigatory and adjudicatory stages of judicial disciplinary proceedings that we draw today. In the most analogous case, *McCartney* v. *Commission on Judicial Qualifications*, 12 Cal. 3d 512, 519, 526 P.2d 268, 116 Cal. Rptr. 260 (1974), the California Supreme Court concluded that a judge who had been the subject of disciplinary proceedings had not been denied due process when he was not apprised of the commission's preliminary investigation into citizen complaints against him. The court concluded that, at the investigatory stage, "the Commission [on Judicial Qualifications] clearly has not yet commenced to perform any adjudicatory function, but is merely attempting to examine citizen complaints in a purely investigatory manner. Accordingly, notice to the judge under investigation as to the nature of the complaints against him is not compelled as a matter of due process." Id. Similarly, other jurisdictions have rejected other claimed due process rights at the investigatory stage of judicial disciplinary proceedings, including: the right to discovery; *In re Petition to Inspect Grand Jury Materials*, 576 F. Sup. 1275, 1284 (S.D. Fla. 1983) ("[d]uring the investigatory stage, the required procedural protections are minimal at most"); the right to be present; *In the Matter of Troy*, 364 Mass. 15, 24, 306 N.E.2d 203 (1973) (investigation before special commissioner

"wholly antecedent to the filing of the Information"); the right to know the identity of one's accusers; *In re Elliston*, supra, 789 S.W.2d 473 (judge is only "entitled to know about the persons who will be called upon to give testimony in a *formal* hearing" [emphasis added]); and the right to cross-examine adverse witnesses; *In re "Judge Anonymous*," 590 P.2d 1181, 1186 (Okla. 1978) ("the proceedings before the Council on Judicial Complaints are only investigatory in nature, as opposed to being adjudicatory in nature").

We conclude that when a citizen complaint against a judge is brought to the attention of the judicial review council, the council has authority subsequently to charge that judge with a violation of § 51-51i based on any conduct of the judge revealed by its investigation into the complaint, whether or not the conduct forming the basis of the charge was contained specifically in the original complaint.[20] This conclusion is consistent with the conclusions reached in other jurisdictions. See *In re Petition to Inspect Grand Jury Materials*, supra, 576 F. Sup. 1284 ("sole duty at the investigatory stage of the Committee's work is to 'conduct an investigation as extensive as it considers necessary' "); *In re Elliston*, supra, 789 S.W.2d 473 (state constitution should not be read "as limiting the Commission's authority to take action against any possible judicial misconduct that might come to its attention").

Two interests must be accommodated in judicial disciplinary proceedings: (1) the review council must have

---

[20] This conclusion is consistent with § 51-51*l* (c), which provides for the adjudicatory hearing: "If a preliminary investigation indicates that probable cause exists that the judge . . . is guilty of *conduct* under § 51-51i, the council shall hold a hearing concerning the *conduct or complaint*." (Emphasis added.) This language and structure supports the conclusion that the initial investigation is triggered by allegations or disclosure of judicial misconduct, but that the formal adjudicatory phase focuses on the facts of the judicial conduct that the investigation yields.

broad authority to investigate the conduct of our judges in order to maintain public confidence in the judiciary; and (2) our judges must be afforded adequate process before discipline is imposed to ensure that discipline is not imposed on the basis of unfounded charges of misconduct. See *Kucej* v. *Statewide Grievance Committee*, 239 Conn. 449, 462–63, 686 A.2d 110 (1996) (similar competing concerns in attorney discipline proceedings). We conclude that our statutory scheme, on its face and as applied here, adequately serves both of those interests. The review council cannot be constitutionally bound by the four corners of citizen complaints that may be incomplete or inaccurate. A judge is only entitled to reasonable notice of the charges upon which he may be disciplined after the review council has determined what those charges are. Discipline may not be imposed in the absence of a formal hearing preceded by reasonable notice of the charges. In this case, Flanagan was provided reasonable notice of the charges after the review council had completed its investigation and before the formal hearing.

## II

Flanagan next asserts that, as a matter of law, the lack of any expert testimony before the review council that a consensual sexual relationship with a married court reporter violates canons 1 and 2A of the Code of Judicial Conduct prevents the review council from finding a wilful violation of those canons in violation of § 51-51i (a) (2). Flanagan claims that our previous decisions in *In re Zoarski*, supra, 227 Conn. 793–94, and *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 525, 560 A.2d 403 (1989), require expert testimony in judicial review proceedings if a majority of the decisionmaking body is not composed of "experts," i.e., either judges or lawyers. We disagree.

*Zoarski* addressed the need for expert testimony in judicial review proceedings in light of our statement

in *Levinson* that, "[a]s long as the board hearing and deciding a [medical] licensing matter is composed of at least a majority of experts in the field involved in the case, the board may rely on its own expertise in evaluating charges against persons licensed by the board and the requisite standard of care by which to judge such cases." *Levinson* v. *Board of Chiropractic Examiners*, supra, 211 Conn. 525. In *Zoarski*, we rejected the judge's claim under *Levinson* for two reasons: (1) at that time, the review council consisted of a "majority of experts" in that its membership included three judges, three lawyers and only five laypersons; and (2) "[i]n addition, this court's searching review of a finding of judicial misconduct assures the application of proper standards in any particular case." *In re Zoarski*, supra, 227 Conn. 794.

This case differs from *Zoarski* in that, since *Zoarski*, the legislature has added an additional layperson to the review council so that the council is now composed of the same number of laypersons as judges and lawyers. Public Acts 1992, No. 92-160, § 2. Because of the present representational balance on the review council, we are now asked to determine whether the "majority of experts" rule expressed in *Levinson* applies to this case. We conclude that it does not.

*Levinson* was drawn from and is part of a body of administrative law jurisprudence that addresses the issue of whether private actors can have their professional or trade competence judged by laypersons who ordinarily would not possess the specific professional or trade expertise necessary to make such a judgment without an expert's opinion. *Levinson* v. *Board of Chiropractic Examiners*, supra, 211 Conn. 525. Such concerns about professional or trade expertise are simply not present here. The issues before the review council were whether Flanagan, by engaging in a consensual sexual relationship with a married court reporter who

regularly had been assigned to his courtroom, had failed: (1) "to observe high standards of conduct so that the integrity and independence of the judiciary might be preserved"; or (2) "to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary . . . ." In determining whether expert testimony was required in this case to support a finding of an ethical violation by Flanagan, we must consider whether "the determination of the standard of care requires knowledge that is beyond the experience of [the] fact finder," i.e., the review council. *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996); see *Jaffe* v. *Dept. of Health*, 135 Conn. 339, 349, 64 A.2d 330 (1949); *Sickmund* v. *Connecticut Co.*, 122 Conn. 375, 379, 189 A. 876 (1937); *Slimak* v. *Foster*, 106 Conn. 366, 368, 138 A. 153 (1927); *Matyas* v. *Minck*, 37 Conn. App. 321, 326, 655 A.2d 1155 (1995); see also *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988) (expert testimony required because nature and cause of victim's injuries "manifestly beyond the ken of the average trier of fact, be it judge or jury").

Unlike *Santopietro*, this is not a case in which the claims to be decided "are akin to allegations of professional negligence or malpractice, which we have previously defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. *Davis* v. *Margolis*, 215 Conn. 408, 415, 576 A.2d 489 (1990)." (Internal quotation marks omitted.) *Santopietro* v. *New Haven*, supra, 239 Conn. 226. The sole issue before the review council was whether a judge's consensual sexual relationship with a married court reporter who regularly had been assigned to his courtroom either compromises the integrity and independence of the judiciary or less-

ens public confidence that such integrity and independence exists. These questions may be answered as competently by those without formal legal training as by those with such training. Although professional opinions may have been relevant to the review council's inquiry in this case and, therefore, admissible,[21] such opinions are unnecessary to a determination of whether certain conduct has the effect of reducing public confidence in the integrity of the judiciary, irrespective of whether the review council is composed of a "majority of experts." Indeed, to create a rule of law requiring expert testimony in judicial discipline cases focusing on the public's perception of the judiciary would contravene the legislature's desire to have an equal "lay" voice on the council as articulated in Public Acts 1992, No. 92-160.[22]

### III

Flanagan next argues that in order for a judge to be disciplined for a "*wilful* violation of . . . any canon of judicial ethics" under § 51-51i (a) (2), the judge must have known "that his alleged conduct was forbidden under the Canons and that he acted with the specific intent to violate said Canons." The review council, on the contrary, contends that, in order to be disciplined under § 51-51i (a) (2), the judge need only have intended to engage in the acts for which he is disciplined without necessarily having specific knowledge that such conduct amounts to a violation of one of the canons. We agree with the review council.

---

[21] Flanagan was permitted to introduce the opinion of an ethics expert. That opinion, however, was rejected by the review council as "not persuasive."

[22] Even if we were to accept Flanagan's argument that a "majority of experts" was necessary in this case to avoid the need for expert testimony, Flanagan concedes that judges would be such "experts" and, therefore, our de novo review would be sufficient to satisfy the rule. See *In re Zoarski*, supra, 227 Conn. 794.

Our inquiry is one of statutory construction. In the context of the statutes pertaining to the discipline of probate judges, which provide for discipline for conduct that "violate[s] any . . . canon of ethics applicable to judges of probate"; General Statutes § 45a-63 (formerly General Statutes § 45-11e); we have stated that "[s]cienter is not essential for the occurrence of an ethical violation. Judges no less than lawyers are chargeable for deviations from the codes governing their conduct, even though the application of the canons to particular circumstances may not be readily apparent." *Patterson* v. *Council on Probate Judicial Conduct*, 215 Conn. 553, 567, 577 A.2d 701 (1990). We have since repeated this same language from *Patterson*, eschewing the necessity for scienter when interpreting § 51-51i (a) (1), which makes sanctionable "conduct prejudicial to the impartial and effective administration of justice which brings the judicial office [into] disrepute." See *In re Zoarski*, supra, 227 Conn. 791. Flanagan claims, however, that in *Zoarski*, we limited the applicability of *Patterson* to cases involving § 51-51i (a) (1), by stating that "[i]n contrast to § 51-51i (a) (2), prejudicial judicial conduct under § 51-51i (a) (1) does not require proof of a wilful violation of the canons of judicial ethics." Id. We disagree with Flanagan's interpretation of the dictum in *Zoarski*. We conclude that specific intent to violate the canons is not required by § 51-51i (a) (2).

" '[W]illful' " is a word " 'of many meanings, its construction often being influenced by its context.' " *Screws* v. *United States*, 325 U.S. 91, 101, 65 S. Ct. 1031, 89 L. Ed. 1495 (1943). In the context of the subsection of our judicial discipline statute that codifies the canons of the Code of Judicial Ethics, the term "wilful" cannot reasonably be read to require a specific intent to violate the canons given the necessarily broad and flexible nature of those canons. *In the Matter of Young*, 522 N.E.2d 386, 388 (Ind. 1988) (canons 1 and 2 not unconsti-

tutionally vague); *In re Gillard*, 271 N.W.2d 785, 809 n.7 (Minn. 1978) ("constitutionality of necessarily broad standards of professional conduct has long been recognized"); *In the Matter of Seraphim*, 97 Wis. 2d 485, 497, 294 N.W.2d 485 (1980) ("greater degree of flexibility and breadth is permitted with respect to judicial disciplinary rules and statutes than is allowed in criminal statutes").

We are persuaded by an opinion of the Supreme Court of Oregon construing a constitutional provision authorizing judicial discipline for a " '[w]ilful violation of any rule of judicial conduct as shall be established by the Supreme Court.' " *In re Gustafson*, 305 Or. 655, 657, 756 P.2d 21 (1988). In response to the sanctioned judge's argument that the term "wilful" required a specific intent to violate a given rule, the Oregon court stated that "ignorance of the governing standards of conduct themselves no more excuses judges than those whom they judge." Id., 660. A judge may be sanctioned for a wilful violation of one of the canons of judicial conduct if he intended to engage in the conduct for which he' is sanctioned "whether or not [he] knows that he violates the rule." Id.

Any other rule would violate the canon of statutory construction that we will avoid constructions that lead to absurd, unworkable or bizarre results. *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 187, 592 A.2d 912 (1991). To require that a judge subjectively have known that his conduct was in violation of the canons of judicial conduct would make it extremely difficult, if not impossible, to discipline a judge pursuant to § 51-51i (a) (2) for violating those canons. Given the broad and flexible nature of the canons, particularly canons 1 and 2A at issue here, competent proof of a judge's specific intent to violate those canons would be nearly impossible to obtain in the absence of a previous authoritative interpretation of the canons, presumably from this court, that certain specific conduct was a

violation. Consequently, the first judge to engage in a given conduct that lessens public confidence in the integrity and impartiality of the judiciary would not be subject to discipline because he would not have been on specific notice that his conduct was prohibited, and he therefore could not be said to have intended to violate the canons. Thereafter, only those judges who engage in the precise conduct of the first judge would be on notice and subject to discipline under § 51-51i (a) (2). We decline to adopt such an unworkable interpretation of § 51-51i (a) (2). We conclude, therefore, that a judge is subject to discipline for a "wilful violation of . . . any canon of judicial ethics" as long as he or she intends to engage in the conduct for which he or she is disciplined, whether or not he or she has the specific intent to violate the canon.

IV

Flanagan next contends that the judicial review council should have dismissed the charges against him because, he argues, Ross violated the confidentiality provision of § 51-51l (a)[23] when she disclosed information to two newspaper reporters during the probable cause investigation. At the probable cause hearing, Ross testified that sometime in January, 1996, approximately two months after she filed her complaint with the judicial review council and one month prior to the probable cause hearing, she acted as the second source for a Hartford Courant story concerning the investigation of Flanagan and his alleged acts of impropriety. Ross testified that the reporter had already been aware of the review council's investigation and that she merely had confirmed elements of the story, which was published in the Hartford Courant on January 20, 1996. After her testimony at the probable cause hearing on February 15, Ross twice was reminded by the chairperson of the

---

[23] See footnote 5.

review council that the probable cause proceedings were confidential. Thereafter, on February 21, 1996, the New Haven Register reported on a February 20, 1996 interview with Ross, given at a time when the probable cause hearing was being conducted, in which she was quoted detailing aspects of her allegations against Flanagan. Flanagan argues that Ross' actions in speaking with the press concerning the allegations in her complaint to the review council amounted to a breach of the confidentiality provision of § 51-51*l* (a). He argues that her breach undermined the fairness of the review council's investigation and required that the review council dismiss all charges against him. He alleges that Ross' public disclosures to the media "irrevocably tainted" the review council's deliberations. See *In re Zoarski* supra, 227 Conn. 794. We disagree.

Section 51-51*l* provides that probable cause hearings shall be confidential and that persons called by the review council for the purpose of providing information shall not disclose their "knowledge of such investigation" to third parties prior to the review council's probable cause decision. In *In re Zoarski*, supra, 227 Conn. 794–95, we stated that violations of the confidentiality provision of § 51-51*l* (a) do not require dismissal of the charges lodged against a judge "[i]n the absence of allegation or proof that [the] . . . public disclosures had any impact whatsoever on the fairness of the council's deliberations . . . ." We found the judge's argument in *Zoarski* unpersuasive because he had not proved, or even alleged, that the confidentiality breaches in that case had affected the fairness of the review council's deliberations in any way.

Flanagan seeks to distinguish the present case from *Zoarski* on the simple basis that, in the present case, he at least alleges that the confidentiality breaches affected the fairness of the review council's deliberations. We conclude that the mere allegation that a § 51-51*l* confi-

dentiality breach has affected the fairness of the review council's deliberations is insufficient, however, to require the dismissal of misconduct charges that have been leveled against a judge. *Zoarski* dictates that such claims of unfairness need to be supported by something more than mere conclusory assertions before dismissal of the charges is required. The only "proof" set forth by Flanagan is his unsupported allegation that the deliberative process of the review council was affected by the media publicity concerning Ross' allegations. While we strongly condemn any effort to influence a decision of the review council through violations of § 51-51*l*, the fact remains that Flanagan stipulated before the review council that he had had an extended sexual relationship with a married court employee. That stipulation contains the only facts necessary to the review council's censure and are the facts upon which we base our independent review. Even if we assume that Ross violated § 51-51*l* when she spoke with the two newspaper reporters, Flanagan has failed to prove that her violation had any impact "on the fairness of the council's deliberations . . . ." *In re Zoarski*, supra, 227 Conn. 795. Therefore, his claim that the review council should have dismissed the charges against him is unfounded.

V

Flanagan next asserts that the review council improperly considered evidence of a coerced or forced sexual relationship at the formal hearing where, he argues, the testimony should have been limited to testimony pertaining to a consensual sexual relationship. While we agree with Flanagan that any evidence of a forced or coerced sexual relationship should have been excluded from the formal hearing, Flanagan has failed to meet his burden of proving that he was harmed by the admission of any such evidence.

The following facts are relevant to this issue. Prior to the formal hearing, Flanagan filed a motion in limine

seeking to exclude all evidence of a nonconsensual sexual relationship. By an eleven to one vote, the review council denied the motion in limine but noted that Flanagan's counsel would be free to object to specific testimony as the need arose. After Ross testified that she had been "raped" and that her relationship with Flanagan had been "nonconsensual," Flanagan moved to strike any testimony about nonconsensual sex. After meeting in executive session, the review council granted the motion to strike all previous testimony about nonconsensual sexual relations. To avoid further testimony about nonconsensual sexual relations, the chairperson of the review council stated: "I would consider this a continuing objection and I will continually grant it. The Council will not consider evidence of sexual acts other than as described in the charges."

Thereafter, Ross again attempted to testify that her relationship with Flanagan had been nonconsensual. Her testimony in that vein consistently was stricken from the record. In response to questions about whether she had had a consensual sexual relationship with Flanagan, Ross twice responded that she had not. Last, Flanagan points to testimony where, before being interrupted by Flanagan's counsel, Ross twice began to testify that Flanagan had "demanded" that she go to his house. In response, the chairperson of the review council instructed counsel to wait until the response had been completed before objecting. Ross then amended her response and did not include any allegation that Flanagan had "demanded" her attendance at his house. Flanagan then objected and was overruled.

Even if we were to assume that there was improper testimony before the review council regarding nonconsensual sexual relations, Flanagan bears the burden of proving that he was "substantial[ly] . . . prejudiced" by the testimony. *Tomlin* v. *Personnel Appeal Board*, 177 Conn. 344, 348, 416 A.2d 1205 (1979). He cannot

meet this burden. The same review council that conducted the formal hearing had already heard and rejected extensive testimony from Ross at the probable cause hearing regarding her claims of rape and coercion. The brief, fragmentary, additional testimony from Ross at the formal hearing concerning nonconsensual sexual relations could not conceivably have resulted in substantial prejudice to Flanagan.[24] Ross was simply not credible on this aspect of her complaint and it is obvious that the review council so found.

## VI

We turn finally to Flanagan's substantive claim. He argues that, as a matter of law, it is not a violation of either canon 1 or 2A for a judge to have had a three and one-half year consensual affair with a married court reporter regularly assigned to his courtroom over the course of the affair. We disagree. We conclude that his conduct was in violation of canons 1 and 2A, and that public censure, the least severe of the possible sanctions, is appropriate.

Canon 1 provides that "[a]n independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective." Canon 2A provides that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The official

---

[24] Flanagan does not challenge the review council's authority to conduct both the preliminary investigation to determine probable cause and the formal hearing. In any event, such due process claims have been routinely rejected. See, e.g., *In re Elliston*, supra, 789 S.W.2d 472; *In the Matter of Deming*, supra, 108 Wash. 2d 105.

commentary to canon 2, approved and adopted by the judges of the Superior Court, provides in relevant part: "Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. The judge must expect to be the subject of constant public scrutiny. The judge must therefore accept restrictions on his or her conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. . . ." When examining a judge's conduct, we must consider "the impact it might reasonably have upon knowledgeable observers." *In re Zoarski*, supra, 227 Conn. 792. We are persuaded that a judge's three and one-half year affair with a married court reporter who regularly had been assigned to his courtroom is conduct properly prohibited by canons 1 and 2A because it reasonably could lead a knowledgeable observer to question the integrity of the judiciary and to lose confidence therein.

"Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. . . . Judges must assiduously avoid those contacts which might create even the appearance of impropriety." (Citation omitted.) *In the Matter of Lonschein*, 50 N.Y.2d 569, 572, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980). "The duty to avoid creating an appearance of impropriety is one of taking 'reasonable precautions' to avoid having 'a negative effect on the confidence of the thinking public in the administration of justice.' *In the Matter of Bonin*, 375 Mass. 680 [706–707, 378 N.E.2d 669] (1978)." *In re Inquiry Concerning a Judge*, supra, 788 P.2d 723.

In concluding that Flanagan's relationship with Ross constituted a violation of canons 1 and 2A, we rely on the combination of elements present in this case: (1) Ross was a subordinate of Flanagan's working regularly in his courtroom and appearing on many occasions in his chambers under circumstances in which one would not normally expect the court reporter to be present; and (2) she was a married woman. Flanagan has emphasized to this court that adultery is no longer a crime in Connecticut and therefore it is not conduct for which a judge may be censured. While it is true that adultery is no longer a criminal offense, the mere fact that conduct is less than criminal does not mean that, if a judge engages in it, he may not diminish public confidence in the judiciary. A judge's conduct is held to a higher standard than that of the average citizen, and must be beyond reproach, at least when that conduct is directly connected to his professional office and functions. Although it may be difficult to assess the degree to which the public at large now may condone or disapprove of one having a sexual affair with a married person, we are persuaded that, in general, such conduct is regarded as improper when it involves a subordinate in a professional, highly sensitive public context. Moreover, we think it is fair to say that a member of the public, aware of the aforementioned combination of factors, would reasonably conclude that the integrity of the judiciary was likely to be impaired.[25] We conclude that public confidence in the integrity of the judiciary is compromised by extended sexual relationships between judges and married court reporters assigned to their courtrooms.

Flanagan notes that in 1991, a proposal was made to amend the official commentary to read, in part, that

---

[25] For instance, such a person could, we believe, reasonably conclude that there was an impermissible *risk* of Ross' failing to render an accurate record of the proceedings in Flanagan's courtroom—either *because* of their relationship or because of an acrimonious termination of that relationship.

"[t]he prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional *and personal* conduct of a judge." (Emphasis added.) Proposed New Code of Judicial Conduct, Connecticut Law Journal, Vol. 52, No. 44 (April 30, 1991). He argues that because the judges failed to adopt that proposal, personal conduct may never form the basis for a violation of canon 2A. Without deciding the merits of that claim, we note that the conduct in this case involved a relationship with a subordinate employed daily in his courtroom. Therefore, this was *not purely personal* conduct, because it took place with a person with whom Flanagan had an ongoing, daily professional relationship. Indeed, as the review council's findings indicate, Ross not only served as the court reporter in Flanagan's courtroom, but "on many occasions [she] was present in [Flanagan's] chambers before the opening of court, during pretrial conferences with counsel present and during recesses," occasions when one would not normally expect that the court reporter would be present. Thus, the risk of injury to public confidence in the integrity of the judiciary is substantially heightened in this instance as opposed to a case where the affair was with a person unconnected with his daily activities as a judge of the Superior Court. See *In re Miera,* supra, 426 N.W.2d 855–56 (distinguishing between sexual advances toward personal friend as opposed to court reporter).

In fairness to Flanagan, we must emphasize that there was absolutely no evidence in this case that any matter before him was ever actually compromised or mishandled in any way. Rather, the evidence adduced at both the probable cause hearing and at the formal hearing indicates that Flanagan was a conscientious, fair minded and widely respected judge in the eyes of his peers as well as those who appeared before him. While such an otherwise exemplary record is certainly rele-

vant to the determination of the appropriate sanction to be imposed, it is not a defense to a violation of the canons of the Code of Judicial Ethics. *In the Matter of Greenfield*, supra, 76 N.Y.2d 297. We conclude that, under all the circumstances of this case, the review council appropriately imposed public censure on Flanagan pursuant to § 51-51n (a) for a violation of the Code of Judicial Conduct.

The decision of the review council is affirmed.

In this opinion the other justices concurred.