## IN RE HONORABLE HAROLD H. DEAN
### (SC 15785)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued February 19—officially released August 11, 1998

*Wesley W. Horton,* with whom were *Kimberly A. Knox, Paul J. Pacifico* and, on the brief, *Kevin B. Hawkins* and *Michele C. Camerota,* certified legal interns, for the appellant (respondent).

*Gregory T. D'Auria,* assistant attorney general, with whom were *Eliot D. Prescott,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, *Carolyn K. Querijero,* assistant attorney general, and *Donald B. Caldwell,* for the appellee (judicial review council).

*Opinion*

KATZ, J. The respondent, Superior Court Judge Harold H. Dean, appeals from the decision of the judicial review council (review council) to censure him publicly for wilfully and intentionally failing to pay a $250 weekly instalment order issued by a Superior Court judge pursuant to General Statutes § 52-356d. The review council is authorized pursuant to General Statutes § 51-51n (a) (1),[1] to censure a judge of the Superior Court publicly

---

[1] General Statutes § 51-51n provides: "Authority of council. (a) The Judicial Review Council may, after a hearing pursuant to subsection (c) of section 51-51*l,* (1) publicly censure the judge, compensation commissioner or family support magistrate, (2) suspend the judge, compensation commissioner or family support magistrate for a definite term not to exceed one year, (3) refer the matter to the Supreme Court with a recommendation that the judge or family support magistrate be suspended for a period longer than one year, (4) refer the matter to the Supreme Court with a recommendation that the judge or family support magistrate be removed from office or to the Governor with a recommendation that the compensation commissioner be removed from office or (5) exonerate the judge, compensation commissioner or family support magistrate of all charges.

"(b) If public censure is recommended, the chairman shall prepare and forward the censure in writing to the judge, compensation commissioner or family support magistrate being censured, the Chief Justice, the Chief Court Administrator and the joint standing committee on judiciary, at least ten days prior to the publication of the censure. The censure shall be a

for a "wilful violation of . . . any canon of judicial ethics" as set forth in General Statutes § 51-51i (a) (2).[2]

public record as defined in section 1-19. An appeal from the decision of the council for public censure shall automatically stay the publication of the censure.

"(c) If the council exonerates a judge, compensation commissioner or family support magistrate, a copy of the proceedings and report of the council shall be furnished to the judge, compensation commissioner or family support magistrate."

[2] General Statutes § 51-51i provides: "Grounds for removal, suspension and censure. (a) In addition to removal by impeachment and removal by the Governor on the address of two-thirds of each house of the General Assembly as provided in the Connecticut constitution, a judge shall be subject, in the manner and under the procedures provided in this chapter to censure, suspension or removal from office for (1) conduct prejudicial to the impartial and effective administration of justice which brings the judicial office in disrepute, (2) wilful violation of section 51-39a or any canon of judicial ethics, (3) wilful and persistent failure to perform his duty, (4) neglectful or incompetent performance of his duties, (5) final conviction of a felony or of a misdemeanor involving moral turpitude, (6) disbarment or suspension as an attorney-at-law, (7) wilful failure to file a financial statement or the filing of a fraudulent financial statement required under section 51-46a, or (8) temperament which adversely affects the orderly carriage of justice.

"(b) In addition to removal by the Governor for cause pursuant to subsection (f) of section 46b-231, a family support magistrate shall be subject, in the manner and under the procedures provided in this chapter to censure, suspension or removal from office for (1) conduct prejudicial to the impartial and effective administration of justice which brings the magisterial office in disrepute, (2) wilful violation of section 51-39a or any canon of judicial ethics, (3) wilful and persistent failure to perform his duty, (4) neglectful or incompetent performance of his duties, (5) final conviction of a felony or of a misdemeanor involving moral turpitude, (6) disbarment or suspension as an attorney-at-law, (7) wilful failure to file a financial statement or the filing of a fraudulent financial statement required under section 51-46a, or (8) temperament which adversely affects the orderly carriage of justice.

"(c) In addition to removal by the Governor for cause pursuant to subsection (e) of section 31-276, a compensation commissioner shall be subject, in the manner and under procedures provided in this chapter to censure, suspension or removal from office for (1) conduct prejudicial to the impartial and effective administration of his duties which brings the office of compensation commissioner in disrepute, (2) wilful and persistent failure to perform his duty, (3) neglectful or incompetent performance of his duties, (4) final conviction of a felony or a misdemeanor involving moral turpitude, (5) disbarment or suspension as an attorney-at-law, or (6) temperament which adversely affects the orderly carriage of his duties."

The review council had initiated an investigation pursuant to General Statutes § 51-51*l*.[3] Thereafter, a confidential probable cause hearing was held to inquire into

[3] General Statutes § 51-51*l* provides: "Investigation of conduct of judge, compensation commissioner or family support magistrate. (a) Except as provided in subsection (d), the Judicial Review Council shall investigate every written complaint brought before it alleging conduct under section 51-51i, and may initiate an investigation of any judge, compensation commissioner or family support magistrate if (1) the council has reason to believe conduct under section 51-51i has occurred or (2) previous complaints indicate a pattern of behavior which would lead to a reasonable belief that conduct under section 51-51i has occurred. The council shall, not later than five days after such initiation of an investigation or receipt of such complaint, notify by registered or certified mail any judge, compensation commissioner or family support magistrate under investigation or against whom such complaint is filed. A copy of any such complaint shall accompany such notice. The council shall also notify the complainant of its receipt of such complaint not later than five days thereafter. Any investigation to determine whether or not there is probable cause that conduct under section 51-51i has occurred shall be confidential and any individual called by the council for the purpose of providing information shall not disclose his knowledge of such investigation to a third party prior to the decision of the council on whether probable cause exists, unless the respondent requests that such investigation and disclosure be open, provided information known or obtained independently of any such investigation shall not be confidential. The judge, compensation commissioner or family support magistrate shall have the right to appear and be heard and to offer any information which may tend to clear him of probable cause to believe he is guilty of conduct under section 51-51i. The judge, compensation commissioner or family support magistrate shall also have the right to be represented by legal counsel and examine and cross-examine witnesses. In conducting its investigation under this subsection, the council may request that a court furnish to the council a record or transcript of court proceedings made or prepared by a court reporter, assistant court reporter or monitor and the court shall, upon such request, furnish such record or transcript.

"(b) The council shall, not later than three business days after the termination of such investigation, notify the complainant, if any, and the judge, compensation commissioner or family support magistrate that the investigation has been terminated and the results thereof. If the council finds that conduct under section 51-51i has not occurred, but the judge, compensation commissioner or family support magistrate has acted in a manner which gives the appearance of impropriety or constitutes an unfavorable judicial or magisterial practice, the council may issue an admonishment to the judge, compensation commissioner or family support magistrate recommending a change in judicial or magisterial conduct or practice. If an admonishment

whether the respondent had: (1) failed or refused to pay periodic payments ordered by the Superior Court in satisfaction of a judgment; (2) failed or refused to satisfy one or more judgments of the Superior Court; (3) submitted a false financial statement to a lender; or (4) fraudulently transferred assets; and whether such conduct, if proved, violated canon 1, canon 2 (a) or canon 5 of the Code of Judicial Conduct (code).[4] The review council found probable cause to believe that the

is issued, the council shall inform the complainant, if any, that an admonishment was issued, provided the admonishment is the result of misconduct alleged in the complaint and the substance of the admonishment shall not be disclosed.

"(c) If a preliminary investigation indicates that probable cause exists that the judge, compensation commissioner or family support magistrate is guilty of conduct under section 51-51i, the council shall hold a hearing concerning the conduct or complaint. All hearings held pursuant to this subsection shall be open. A judge, compensation commissioner or family support magistrate appearing before such a hearing shall be entitled to counsel, to present evidence and to cross-examine witnesses. The council shall make a record of all proceedings pursuant to this subsection. The council shall not later than fifteen days after the close of such hearing publish its findings together with a memorandum of its reasons therefor.

"(d) No complaint against a judge, compensation commissioner or family support magistrate alleging conduct under section 51-51i shall be brought under this section but within one year from the date the alleged conduct occurred or was discovered or in the exercise of reasonable care should have been discovered, except that no such complaint may be brought more than three years from the date the alleged conduct occurred.

"(e) Notwithstanding the provisions of subsections (a) and (b) of this section, the council shall disclose any information concerning complaints received by the council on and after January 1, 1978, investigations, and disposition of such complaints to the legislative program review and investigations committee when requested by the committee in the course of its functions, in writing and upon a majority vote of the committee, provided no names or other identifying information shall be disclosed.

"(f) On and after December 19, 1991, any judge, compensation commissioner or family support magistrate who has been the subject of an investigation by the Judicial Review Council as a result of a complaint brought before such council may request that such complaint, investigation and the disposition of such complaint be open to public inspection."

[4] Canon 1 of the Code of Judicial Conduct provides in relevant part: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforc-

respondent, by having wilfully failed or refused to pay periodic payments ordered by the Superior Court in satisfaction of a judgment, had violated canons 1 and 2 (a) of the code and § 51-51i.[5]

After the public hearing held pursuant to § 51-51*l* (c); see footnote 3 of this opinion; the review council made fifteen findings of fact. "1. The respondent was, at all relevant times, an active judge of the Connecticut Superior Court. 2. On April 28, 1987, the respondent, along with others, signed a promissory note in favor of Bank-Mart, a financial institution. Each signee agreed to pay BankMart $75,000 plus interest upon demand. 3. Subsequent to April 28, 1987, the note was acquired by DAP Financial Management Company [DAP Financial]. 4. In 1994, Attorney Edward Botwick was engaged to attempt collection of the note. 5. Suit was commenced against the respondent by writ dated November 15, 1994, under the title *DAP Financial Management Company* vs. *Harold Dean et al.* in Superior Court for the Judicial District of Fairfield, at Bridgeport. 6. A default judgment against the respondent was entered on January 17, 1996, for a total of $129,500 including principal, interest, and attorney's fees. At the time of judgment, an order of payment of $15 per week was entered, effective February 9, 1996. 7. On February 9, 1996, the office of Attorney

ing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 2 (a) of the Code of Judicial Conduct provides: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Canon 5 of the Code of Judicial Conduct provides in relevant part: "A Judge Should Regulate His Extrajudicial Activities to Minimize the Risk of Conflict with His or Her Judicial Duties . . . ."

[5] The formal charge brought against the respondent was as follows: "The Honorable Harold H. Dean wilfully failed or refused to pay periodic payments ordered by the Connecticut Superior Court in satisfaction of a judgment, which conduct resulted in violation of Canon 1 and Canon 2 of the Code of Judicial Conduct and Section 51-51i of the Connecticut General Statutes."

Botwick received a check from, or on behalf of, the respondent in the amount of $780, representing one year of $15 payments. 8. On August 7, 1996, upon motion of [DAP Financial], the court, after a hearing attended by and contested by the respondent and counsel, increased the amount of weekly payments to $250 per week.[6] 9. The last line of the court's memorandum of decision reads, 'The defendant is ordered to pay to the plaintiff the sum of $250 per week until said judgment is paid in full.' 10. The $780 check received on February 9, 1996, paid the $15 per week order through August 2, 1996, and the $250 per week order for August 9, 1996. Further the sum of $140 was applied to the $250 payment due on August 16, 1996. 11. The balance of $110 due on August 16, 1996, was never paid. None of the weekly payments of $250 were made from August 23, 1996, to March 31, 1997.[7] 12. The respondent made the $250 per week payments from March 31, 1997, to July 11, 1997, when he filed for bankruptcy. 13. The respondent claims the $250 per week order was terminated when a wage execution was issued on October 23, 1996, and was revived on March 5, 1997, when the wage execution was revoked. 14. The respondent failed, wilfully, to pay periodic payments ordered by the Superior Court from August 16, 1996, to October 23, 1996.[8] 15. The conduct examined by the [review council] did not affect his judicial duties or responsibilities."

On the basis of these findings, the review council, by a vote of eleven to one, recommended a public censure

[6] In the memorandum of decision, Judge Doherty, on the basis of the financial affidavit of the respondent regarding his income, assets and liabilities, concluded that the respondent's "disposable income [was] more than sufficient to warrant an appreciable increase in the existing weekly order."

[7] The respondent made no weekly payments from August 23, 1996, to March 31, 1997; the review council, however, did not find a violation for the time period between October 23, 1996, and March 31, 1997.

[8] The review council's finding of wilfulness presumably was based, at least in part, upon the testimony by the respondent that he intended not to make the $250 payments and felt no obligation to make the payments.

of the respondent on the grounds that his "intentional and wilful failure . . . to make weekly payments ordered by the Connecticut Superior Court between August 16, 1996, and October 23, 1996, resulted in his failure to observe high standards of conduct so that the integrity of the judiciary might be preserved, and resulted in his failure to act at all times in a manner that promotes public confidence in the judiciary" in violation of canons 1 and 2 of the code. The respondent appealed directly to this court pursuant to General Statutes § 51-51r.[9]

The respondent raises the issue of whether his refusal to comply with an instalment payment order under § 52-356d provides a basis for judicial discipline. He phrases the issue as follows: "Is a refusal to comply with an instalment order under General Statutes § 52-356d a basis for judicial discipline?" The review council's counterstatement of the issue more accurately reflects its ruling and the question before us: "Did the [review council] properly discipline the respondent judge in the circumstances of this case for wilfully and intentionally failing to pay a weekly instalment order of $250, which a Superior Court judge ordered him to pay and had determined he could afford to pay?"

Before analyzing the respondent's claims on appeal, we first set forth the appropriate standards of review for the factual findings and legal conclusions of the review council, as recently articulated by this court in *In re Flanagan*, 240 Conn. 157, 690 A.2d 865, cert. denied, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997). "In reviewing the factual determinations of the review council, we must take into account the risk that unfounded charges of judicial misconduct will impair

---

[9] General Statutes § 51-51r provides: "Appeals, rules. Any judge or family support magistrate aggrieved by any decision of the Judicial Review Council may appeal the decision to the supreme court in accordance with such procedure for the appeal as the Supreme Court shall adopt by rule."

society's interest in an independent judiciary. We must therefore depart from our normal rule of deference to factfinding by trial courts and administrative agencies. We have a nondelegable responsibility, upon an appeal, to undertake a scrupulous and searching examination of the record to ascertain whether there was substantial evidence to support the council's factual findings. . . . *In re Zoarski,* 227 Conn. 784, 789–90, 632 A.2d 1114 (1993); *Council on Probate Judicial Conduct re: James H. Kinsella,* 193 Conn. 180, 192, 476 A.2d 1041 (1984).

"As to the review council's ultimate legal conclusion that the facts found support a finding of a violation of one or more of the canons of the [code], we are persuaded that our review should be de novo. Pursuant to the constitution of Connecticut, article fifth, as amended by article eleven of the amendments, all judges within the state may, in such manner as shall by law be prescribed, be removed or suspended by the supreme court. In addition to the authority it bestows upon this court, article fifth, as amended by article eleven of the amendments, also permits the General Assembly to create a judicial review council with the power to censure or to suspend any judge for a period not to exceed one year. The constitutional provisions relating to the disciplinary powers of this court have been codified at General Statutes § 51-51j.[10] Similarly,

[10] General Statutes § 51-51j provides: "Removal or suspension by Supreme Court. (a) The Supreme Court may remove or suspend any judge or family support magistrate for any period upon recommendation of the Judicial Review Council, established under section 51-51k, or on its own motion. Upon receipt of such recommendation or on its own motion, the Supreme Court shall make an investigation of the conduct complained of and hold a hearing thereon, unless such an investigation and hearing has been held by the Judicial Review Council.

"(b) If the recommendation or motion involves the conduct of a member of the Supreme Court, such member shall be disqualified with regard to the investigation, hearing and decision on the recommendation or motion.

"(c) Hearings under this section shall not be public unless requested by the judge or family support magistrate under investigation.

"(d) In determining whether to remove or suspend a judge or family support magistrate from office, the determination shall be made by a full

the constitutional provisions pertaining to the powers of the review council have been codified at . . . § 51-51n.[11] Additionally . . . § 51-51r provides that any judge aggrieved by a decision of the review council may appeal that decision directly to this court. . . . [I]n those instances in which the action deemed appropriate by the review council is a one year suspension or any lesser form of discipline, this court may always review such decisions of the review council under § 51-51r.

"Because we are empowered, by the constitution as well as by § 51-51j, to determine all matters of judicial discipline in the first instance as well as upon appeal of the review council's decisions, we conclude that our review of the review council's legal conclusions is de novo. This approach promotes consistency in the enforcement of judicial discipline and finds support in the decisions of many of our sister Supreme Courts." (Internal quotation marks omitted.) *In re Flanagan,* supra, 240 Conn. 165–67.

We turn next to the merits of the respondent's contention on appeal. It is useful to begin with what he does not claim. The respondent does not argue with the review council's finding that his failure, from August 16, 1996, to October 23, 1996, to make the periodic payments ordered by Judge Doherty was "intentional and wilful." Although he claimed before the review council that he could not afford to make the $250 payments,[12] he made no payment of *any* kind during the pertinent time period, and he does not challenge either

court, as provided in section 51-207. A judge or family support magistrate shall not be removed except on the concurrent opinion of the members of the full court as provided in section 51-207, and a judge or family support magistrate shall not be suspended for any period of time, except upon a majority vote of the court."

[11] See footnote 1 of this opinion.

[12] At one point during his testimony, however, the respondent also stated that his nonpayment of $250 "really ha[d] very little to do with the amount" in light of the fact that he owed $700,000.

the evidentiary support for the review council's finding of wilfulness or its lack of a finding that he could not afford to make the $250 payments. We therefore proceed with the premise, which the record supports, that the respondent could afford to make the payments ordered. Nor does the respondent argue that violation of a court order cannot constitute a violation of the code when a judge is acting in a private capacity. See *In the Matter of Disciplinary Proceedings Against Staege*, 165 Wis. 2d 21, 24–25, 476 N.W.2d 876 (1991). Rather, he argues that, because refusal to pay the order could not result in a finding of contempt, the instalment payment order pursuant to § 52-356d was not a "coercive order" and, therefore, its violation could not constitute judicial misconduct.[13] The respondent also argues that, because at all times relevant to this case he was exempt from a wage execution,[14] the legislature's intent to immunize the salaries of public officials, including judges, from wage executions, reflects its intent that an order pursuant to § 52-356d be noncoercive. Essentially, the respondent argues that § 52-356d is merely an instalment payment statute that operates as part of a statutory scheme of postjudgment collection procedures available to creditors. Therefore, he contends that the $250 payment order was merely a "judicial pronouncement," not a judicial order the violation of which could subject him to scrutiny by the review council. We are not persuaded that his claim warrants reversal of the review council's conclusions.

---

[13] At the public hearing before the review council, the respondent testified that he had disobeyed the order upon advice of counsel that he could disregard it because it was not enforceable by contempt. The respondent continues to deny that the weekly order was an order of the court, and indeed, he claims that the statute, by including provisions for a wage execution, anticipates nonpayment.

[14] The wage execution in this case was vacated by the Superior Court, *Stevens, J.*, on March 5, 1997, in reliance on *Prudential Mortgage & Investment Co.* v. *New Britain*, 123 Conn. 390, 195 A. 609 (1937).

We begin with § 52-356d, the instalment payment statute, and, therefore, apply well established principles of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Dash*, 242 Conn. 143, 146–47, 698 A.2d 297 (1997).

Section 52-356d (a) provides for an "order for instalment payments" that, following a hearing, and after the court has evaluated the debtor's financial circumstances, the court may enter to facilitate payment of the judgment. The term "order" is used in each of the six subsections of the statute. See General Statutes § 52-356d ([a] "the judgment . . . debtor may move the court for an *order* for instalment payments"; [b] "compliance with the instalment payment *order*"; [c] "on motion of the judgment creditor for an *order* of nominal payments"; [d] "[a]n instalment payment *order* shall not be enforced by contempt"; [e] "[i]nterest on a money judgment shall continue to accrue under any instalment payment *order*"; and [f] "[o]n motion of either party . . . the court may make such modification of an instalment payment *order* as is reasonable" [emphasis added]). Although the legislature could have chosen the word "schedule," had it intended merely to facilitate payment, it did not. Instead, the term "order" has been employed continuously since the legislature first authorized instalment payments. See General Statutes (1939 Rev.) § 1414e; General Statutes (1937 Rev.) § 846d. We presume that the legislature had a purpose

in choosing the word "order" rather than the term "schedule" or some other similar term. *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 391, 618 A.2d 1340 (1993) (legislative intent is to be determined by analysis of language *actually used* in legislation); see *Kinney* v. *State*, 213 Conn. 54, 62, 566 A.2d 670 (1989).

The respondent relies heavily on the fact that, because his noncompliance with the $250 payment order could not subject him to contempt; see General Statutes § 52-356d (d); it is not an order that must be obeyed.[15] Whether the failure to comply is subject to contempt, however, is not determinative of whether the failure to comply can constitute a violation of the code. Originally, the statute authorizing an order for an instalment payment, General Statutes (1937 Rev.) § 846d, provided: "Failure of either party to obey any order made hereunder may be punishable as contempt of court." In 1939, during the depression,[16] the legislature amended the statute to remove contempt as a sanction. See General Statutes (1939 Rev.) § 1414e. At the public hearing before the review council, the respondent testified that he was not sure whether the $250 weekly order

[15] Indeed, the respondent argues that the payment order is no different from the underlying judgment of $129,500 issued by the court. According to the respondent, the legislature anticipated a judgment debtor's failure to pay a judgment and the refusal to pay an instalment payment order as evidenced by the various methods of execution. See, e.g., General Statutes §§ 52-355a through 52-356c, 52-361, 52-365, 52-367a through 52-367b, 52-380a through 52-380i, and 52-361a. Thus, the respondent claims that the refusal to pay a weekly order merely deprives the debtor of a safe haven from a wage execution. Whether the respondent could have been found to have committed misconduct in violation of the code due to his failure to pay the underlying judgment is not properly before the court because the review council did not find probable cause to charge him based upon that allegation, and, therefore, we express no opinion in that regard. We note, however, that the respondent had paid one year worth of payments toward that judgment pursuant to the first payment order.

[16] The legislative removal of contempt as a sanction for failure to comply with an order of payments also may have reflected the modern abolition of the notion of imprisonment for failure to pay civil, nonfamily judgments, or "debtor's prison."

was a court order. He argued that even if it was a court order, however, it was an order that could not be violated and, therefore, was unenforceable, due to the fact that there could be no finding of contempt for wilful nonpayment.

We do not agree with this argument. Whether a judge's conduct compromises the integrity of the court or lessens public confidence in the judicial system cannot turn on whether contempt can lie. *In re Lemoine*, 692 So. 2d 358, 360 (La. 1997) ("violation of law is not a necessary prerequisite for finding misconduct warranting judicial discipline"). "By accepting his office, a judge undertakes to conduct himself in both his official and personal behavior in accordance with the highest standard that society can expect." *Cincinnati Bar Assn.* v. *Heitzler*, 32 Ohio St. 2d 214, 221, 291 N.E.2d 477 (1972), cert. denied, 411 U.S. 967, 93 S. Ct. 2149, 36 L. Ed. 2d 687 (1973). That standard cannot be gauged by whether the conduct is punishable by contempt.

Additionally, whether a particular debtor is exempt from a wage execution is also not determinative of whether the trial court's order of weekly payments constitutes a court order that can be disregarded at will, nor is it indicative of the legislature's intent that § 52-356d be noncoercive. This court held in *Prudential Mortgage & Investment Co.* v. *New Britain*, 123 Conn. 390, 393, 195 A. 609 (1937), that a public officer's salary could not be garnished because the court considered it more prudent to enable the public officer to concentrate solely on serving the public rather than to be anxious about his means of subsistence. The court in that case sheltered the respondent from a wage execution, and therefore, from that particular legislatively crafted sanction. Id., 394.[17] To conclude, however, from that case

---

[17] We note that No. 97-132, §§ 7 and 8, of the 1997 Public Acts, in effect nullified the holding of *Prudential Mortgage & Investment Co.* v. *New Britain*, supra, 123 Conn. 393, with respect to elected and appointed state officials.

that in the present case, the court (*Doherty, J.*) that issued the order, the creditor (DAP Financial) who sought the order, the legislature that provided for the order and other debtors who, because they are not public officers, are subject to similar orders, could not reasonably expect some effort at compliance by the respondent is to place form over substance. Exceptions do not eliminate rules.

On appeal, the respondent contends that § 52-356d is for the sole benefit of the debtor. On the basis of the language of the statute, the creditor, who pursues the action to judgment and to a hearing to determine the debtor's ability to pay, and the court, which exhausts judicial time and resources to hold a hearing and issue a reasoned decision, reasonably can expect that the debtor will appreciate the order as an order of the court that is not to be ignored. The rule of law must, to survive, depend on the willingness of litigants, public officials, and the public in general to respect the exercise of judicial authority. What the respondent relies upon as a defense is merely the practicality of a situation in which a debtor who has no reachable assets decides to ignore an instalment payment order because the enforcement device will cause him no harm.

In responding to the respondent's assertions, our analysis goes beyond matters of statutory construction. We must not lose sight of the code against which a judge's behavior is measured. Canon 1 provides that "[a]n independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective." Canon 2 (a) provides that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes

public confidence in the integrity and impartiality of the judiciary." The official commentary to canon 2, approved and adopted by the judges of the Superior Court, provides in relevant part: "Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. The judge must expect to be the subject of constant public scrutiny. The judge must therefore accept restrictions on his or her conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. . . ." When examining a judge's conduct, we must consider "the impact it might reasonably have upon knowledgeable observers." (Internal quotation marks omitted.) *In re Zoarski*, supra, 227 Conn. 792.

The broad injunction against the "appearance of impropriety" relates to the entire spectrum of judicial conduct. That no unethical or untoward act may occur is implicit in the canon's emphasis on "appearance." The conduct under scrutiny must therefore be evaluated from the perspective of the "eye of the beholder." *In the Matter of Lonschein*, 50 N.Y.2d 569, 572, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980). Avoiding the appearance of impropriety is as important to developing public confidence in the judiciary as avoiding impropriety itself. The responsibility of the judge extends not only to the business of the courts in its technical sense, such as the disposition of cases, but also to the business of the judge in an institutional sense, such as the avoidance of any stigma, disrepute, or other element of loss of public esteem and confidence in respect to the court system from the actions of a judge. In short, a judge must conduct himself or herself in such a fashion as to promote and preserve the integrity of the judiciary.

To that end, "[m]embers of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting

standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary." (Citation omitted.) *In the Matter of Lonschein,* supra, 50 N.Y.2d 572. "The duty to avoid creating an appearance of impropriety is one of taking 'reasonable precautions' to avoid having 'a negative effect on the confidence of the thinking public in the administration of justice.' *In the Matter of Bonin,* 375 Mass. 680 [707, 378 N.E.2d 669] (1978)." *In re Inquiry Concerning a Judge,* 788 P.2d 716, 723 (Alaska 1990).

It is significant, therefore, that, although the conduct of the respondent involved in this case is private, as opposed to official or judicial conduct, it relates directly to the system of justice in which he, in his official capacity, plays a central role. The viability of our system of justice depends in large part on voluntary compliance with its orders, because if every order were ignored until its target were coerced into compliance, public confidence in the system would be seriously impaired. Thus, it is reasonable to require upon pain of sanction, that a judge comply voluntarily with an order that he is capable of complying with, in order to maintain the public's confidence.

The parties have not cited to, nor have we found, any case directly on point with the present case. Our research has, however, led us to other relevant cases in which the refusal to comply with certain conduct prescribed by the court subjected the offending judge to discipline.

*In the Matter of Glancey,* 515 Pa. 201, 204, 527 A.2d 997 (1987), two judges, in responding to a financial disclosure statement regarding their personal finances required by the Pennsylvania Supreme Court, relied on

the fifth amendment to the United States constitution in refusing to answer a question requiring them to list all gifts they had received that had a value of $200 or more. The administrative office of the Pennsylvania courts referred the matter to the judicial inquiry and review board, which, following a hearing, issued formal charges against the judges, charging them, inter alia, with violating canons 1 and 2 of the code. Id., 205. The board concluded that although the replies given by the two judges constituted a proper exercise of their fifth amendment privilege against self-incrimination, the judges were nevertheless guilty of misconduct that constituted violations of the canons as charged and recommended their removal from judicial office. Id., 207. On appeal, the judges claimed that it would be inconsistent with their fifth amendment privilege to penalize them for having invoked it and that the recommendation of their removal violated their right to due process because they had not been put on notice that their conduct could subject them to such sanctions. The court stated that the disclosure of gifts of a certain value is designed to assure the public of the impartiality and honesty of office holders, and to promote public confidence in the judicial system. Id., 207–208. Therefore, "the fifth amendment is not a bar to the removal of a judicial officer for refusing to provide the information sought."[18] Id., 217.

In *In re Kading*, 74 Wis. 2d 405, 246 N.W.2d 903 (1976), the Wisconsin Supreme Court reviewed a

---

[18] Because the court determined that the judges reasonably may not have been aware that their conduct could constitute misconduct subject to sanctions, they were given thirty days within which to answer the question. Their failure to comply would result in their removal by the board. *In the Matter of Glancey*, supra, 515 Pa. 218. In the present case, the respondent does not claim that he was unaware that his failure to comply with a court order could subject him to sanctions under the code. Rather, his claim is confined to the issue of whether the $250 payment order was such an "order."

judge's refusal to complete a financial disclosure statement as required by rule 17 of the Wisconsin judicial commission. In a prior decision, the court had determined that the judge was required to comply with the rule and gave him a reasonable time within which to comply. *In re Kading*, 70 Wis. 2d 508, 533, 235 N.W.2d 409 (1975). The judge filed a motion for a rehearing raising the issue of sanctions and the court held, in a subsequently rendered separate opinion on the motion, that the available sanctions provided in the Wisconsin Code of Judicial Ethics included reprimand and censure, but that the failure to file the financial report would not merit civil contempt. Id., 543c. When the judge did not comply with the earlier order, the court, in another separate opinion, issued a reprimand and warned him that his failure to file a new report by a particular date might expose him to contempt. Id., 543f. When he failed to comply with that order, the court issued a third order directing the judge to comply and to show cause at a hearing why he should not be held in contempt. *In re Kading*, supra, 74 Wis. 2d 408. When he again failed to comply, the court referred the matter to the judicial commission. The commission found that the judge had violated rule 17 and recommended that because censure previously had been ineffective in getting him to comply, the court should take other appropriate action to ensure compliance. Id. Thereafter, the court found the judge in contempt holding that "[a] judge, perhaps more than anyone else, is aware of the central role the rule of law plays in our society. The rule of law is dependent, however, on the willingness of litigants, public officials, and the public in general to respect the exercise of judicial authority. We have established procedures for challenging the exercise of judicial power, but when that challenge is unsuccessful, there must be compliance with the court's decision or the rule of law will be destroyed. A judge who daily

presides in court and makes rulings and decisions can only weaken his own judicial authority by refusing to comply with a judgment of the Supreme Court of this state simply because he disagrees with the judgment." Id., 411–12.

In *In the Matter of Williams*, 701 A.2d 825, 831 (Del. Jud. 1997), the Court on the Judiciary held that public censure and a three month suspension of a part-time judge and practicing attorney was warranted based upon his failure timely to pay withholding taxes for his law firm's employee payroll, failure timely to pay property taxes, failure timely to pay parking fines, and for filing false certificates with the court as a practicing attorney. The judge in question occupied a unique status as a part-time judge and practicing attorney, and his conduct under review pertained to his law practice and behavior as a private citizen. Id., 826. Although the facts are perhaps unique, the court's treatment of the issues was quite orthodox. Following publication of certain newspaper articles regarding the judge's alleged unpaid parking tickets and unpaid taxes, the Court on the Judiciary assigned to a preliminary investigatory committee the task of investigating whether there was probable cause to believe that the judge had violated the Delaware Canons of Judicial Ethics. Id., 827. The Delaware Chief Justice, as part of the Court on the Judiciary, then appointed a board of examining officers (board), which found that as of March, 1996, the part-time judge and practicing attorney had failed to pay federal, state and city payroll taxes for his law firm and had failed timely to file withholding reports. Id. The board also found that the judge had failed to pay his property taxes in a timely fashion and that he had approximately twenty-nine parking tickets outstanding for vehicles owned by him or registered in his name. Id., 828. Finally, the board found that the judge had improperly represented in his 1995 Supreme Court Certificate of Compliance that he

had complied with client account reconciliation requirements when in fact he had not. Id., 829–30. The court then concluded, based upon the facts found by the board, that the judge had engaged in a deliberate pattern of not paying taxes on a particular property until he desired to sell it, until the property was threatened with monition, or until his failure to pay was made public. Id., 827–28. His failure to pay his taxes in a timely fashion and his failure to file payroll withholding reports demonstrated a pattern of misconduct in violation of canons 1 and 2A of the Delaware Judges' Code of Judicial Conduct. By his conduct, the judge "placed himself above the law" and displayed a "cavalier attitude toward the law . . . ." Id., 831. Because the judge had other available options, the court determined that the judge's financial and personal problems did not excuse his conduct. Id. With regard to the parking tickets, the court recognized that the judge paid many of the tickets and protested others, but found that his untimely conduct in the payment and protesting of the tickets also violated canons 1 and 2A. Id., 833. The court remarked that, although the judge himself had not dismissed the tickets, his conduct created the appearance in the mind of a reasonable person that he had indeed dismissed his own tickets. Id., 833 and n.22. His "failure to pay or to protest his tickets in a timely manner" was a violation of canons 1 and 2A. Id., 833. Finally, the court held that his failure to answer correctly the questions on the Supreme Court Certificate of Compliance, a failure of the sort that a few years previously had resulted in the judge's reprimand, was a violation of canon 2A. Id.

As previously stated, avoiding the appearance of impropriety is as important to maintaining public confidence in the judiciary as avoiding impropriety itself. Therefore, the invocation of the judge's fifth amendment privilege against self-incrimination in *In the Matter of Glancey*, supra, 515 Pa. 201, did not insulate him

from the code or protect him from its sanctions. Like the court in *In re Kading*, supra, 74 Wis. 2d 405, we have established procedures for challenging the exercise of judicial power, but when that challenge is unsuccessful, there must be compliance with the court's decision or the rule of law will be destroyed.[19] A judge who daily presides in court and makes rulings and decisions can only weaken his own judicial authority by refusing to comply with an order.

In this case, despite other available options,[20] the respondent made no attempt to comply with the payment order in *any* manner and, indeed, only began

[19] Although he claimed before the council that he could not afford the $250 weekly order, the respondent in the present case made no payment of *any amount* during the time in issue. He also took no steps to have the order reviewed. At oral argument before this court, the respondent maintained that the weekly order could not be appealed. Although there is no recent authority for the right to appeal from an instalment payment order under § 52-356d or from the execution on wages under General Statutes § 52-361a, a denial of a motion for an order of weekly payments has been held to be appealable; see *Hartford Federal Savings & Loan Assn.* v. *Bowen*, 3 Conn. Cir. Ct. 86, 87, 208 A.2d 364 (1964); and an appeal from the denial of a wage execution has been allowed. *State* v. *Florence*, 35 Conn. Sup. 598, 602–603, 401 A.2d 65 (1978). The absence of a contempt citation strongly militates in favor of an appeal because there otherwise would be no ability for the debtor to attain review of the order. In any event, we need not decide that question definitively, because the respondent did not seek to appeal, and at this stage of the proceedings, the record establishes that he could have made the payments ordered.

[20] In addition to the prospect of filing an appeal, which the respondent did not entertain, there was also the option of filing for bankruptcy, which he had been advised to do as early as 1991, and again shortly after the modification order in August, 1996. The respondent testified that he had not wanted to file for bankruptcy because he was embarrassed and could not decide what he wanted to do. He ultimately filed for bankruptcy on July 11, 1997, five days before the probable cause hearing in this matter and eleven months after the modification of the order of payments. At oral argument before this court, the review council suggested that, had the respondent exercised his federal right and filed immediately for bankruptcy, there would have been no basis upon which to charge him with the code violations.

There are reasons that could account for such differing treatment by the review council. In the case of bankruptcy, the debtor must confront his or

paying the $250 weekly order because of the adverse publicity he had received as a result of this case. Some members of the review council were incredulous of some of his responses to their questions. See *In the Matter of Williams,* supra, 701 A.2d 825. The respondent's claim, and that of the dissenting member of the review council, that he did "no more or less [than] what any judgment debtor had the right to do under the statute" is both inaccurate and unavailing. Although there are other debtors who have benefited from the decision in *Prudential Mortgage & Investment Co.* v. *New Britain,* supra, 123 Conn. 393, the respondent is a judge and "[m]ore is expected of him and, since he is a judge, rightfully so." *In re Troy,* 364 Mass. 15, 71, 306 N.E.2d 203 (1973); see *Geiler* v. *Commission on*

---

her financial situation, account for all assets and liabilities, and satisfy certain statutory requirements in order to take advantage of its protections. Chapter 7 of the Bankruptcy Code; 11 U.S.C. § 101 et seq.; establishes the concept of equitable distribution among creditors of a debtor's resources. 1 W. Collier, Bankruptcy (15th Ed. Rev. 1997) ¶1.03 [2] [a], p. 1-21. Therefore, debtors must file a complete schedule of liabilities or risk the omitted debt being held nondischargeable. See 11 U.S.C. §§ 521, 523 (a). The debtor is required to appear for examination to allow the bankruptcy trustee to inquire into financial matters, matters affecting the estate and the discharge. See 11 U.S.C. § 343. Some claims are excepted from discharge. 11 U.S.C. § 523 (a) (1) through (18). In chapter 13 of the Bankruptcy Code, entitled "Adjustment of Debts of an Individual with Regular Income," the trustee collects the money required by the plan for distribution to creditors to make payments. See 11 U.S.C. § 1302 (b). The purpose is not to force a liquidation of assets, but, rather, to use future income for the payment of debt to the extent possible. See H.R. Rep. No. 595, 95th Cong., 1st Sess. 1977, p. 118. Although the Bankruptcy Code does not require a minimum amount for payment out of future income, when an objection to confirmation of a plan is lodged, the debtor must provide for the use of all disposable income over the life of the plan. 1 W. Collier, supra, ¶1.03 [6], p. 1-50. The chapter 13 trustee fashions a budget and prepares a plan in order to obtain confirmation by the court, and discharge is obtainable when the plan has been consummated, which generally takes three years, but can be extended to five years. 11 U.S.C. § 1322 (d). Here, the respondent, knowing that the debt could not be eliminated through a wage execution, by failing to make the payment despite his financial ability to do so, escaped all financial consequences of his situation.

*Judicial Qualifications*, 10 Cal. 3d 270, 281, 515 P.2d 1, 110 Cal. Rptr. 201 (1973), cert. denied, 417 U.S. 932, 94 S. Ct. 2643, 41 L. Ed. 2d 235 (1974) ("[i]t is immaterial that the conduct concerned was probably lawful"); J. Shaman, S. Lubet & J. Alfini, Judicial Conduct and Ethics (2d Ed. 1995) § 10.20, p. 330 ("something more than simple obedience to the law is required").

"The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter [the judge] from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of [this state] that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men." (Internal quotation marks omitted.) *In re Zoarski*, supra, 227 Conn. 798–99.

We recognize that the respondent has served with distinction for twenty-nine years and that his conduct did not affect his judicial duties and responsibilities. Although admirable, these factors are irrelevant in deciding *whether* the conduct in issue violated the code. Nor are such attributes dispositive of *whether* sanctions should be imposed.[21] Such considerations come into

---

[21] In his dissent, Justice Berdon states that, even if the respondent's conduct constitutes prohibited conduct under the code, he disagrees with the review council's decision to impose a sanction. Whether the review council could have afforded the respondent the opportunity to comply, ten months

play only as part of the determination as to the appropriate sanction after those issues have been resolved against the judge. *In re Flanagan,* supra, 240 Conn. 191–92.

In its discharge of its responsibilities to protect the integrity of the judiciary, the council properly concluded that the respondent violated canons 1 and 2 (a) of the code.

The decision of the review council is affirmed.

In this opinion BORDEN and PALMER, Js., concurred.

MCDONALD, J., concurring in part and dissenting in part. I agree with the majority that the judicial review council's censure of Judge Dean was appropriate.

Judge Dean failed to make court-ordered weekly instalment payments of $250 from August 16, 1996, until October 23, 1996. From November, 1996, to March, 1997, Dean litigated the issue of whether a wage execution could be imposed upon his state salary. Following a court ruling that Judge Dean's state salary would be exempt from a wage execution, there was a great deal of adverse publicity. The media reported that Dean had a $100,000 salary as a judge that was exempt from a wage execution, and that he failed to make instalment payments. As a result of this publicity, Dean paid $250 weekly instalments from the end of March, 1997, until July, 1997, when he filed for bankruptcy. Since Dean never made the instalment payments from August, 1996, to October, 1996, however, the council censured him.

later, with the instalment order, and whether such opportunity would have been a proper exercise of its discretion are issues that are not before the court. We note that the respondent has never sought such relief, and has, throughout the proceedings, taken a position denying the code violation. Therefore, we do not agree that the review council was *required,* as a matter of law, to afford the respondent the opportunity to obviate the sanction.

The instalment order was principally a precondition to obtaining a wage execution, the only means, in Dean's case, by which a creditor could collect on a valid judgment. See General Statutes §§ 52-356d (a) and 52-361a. Section 52-356d,[1] which authorizes an order for "instalment payments," provides that a "judgment creditor or judgment debtor may move . . . for an order for instalment payments"; General Statutes § 52-356d (a); and, in the case of consumer judgments, that compliance with the order "shall stay any property execution . . . ." General Statutes § 52-356d (b). Section 52-356d also provides that the order shall not be enforced by contempt proceedings, but upon default, a wage execution may be sought. General Statutes § 52-356d (d). Section 52-361a provides that when instalment payments are not made, a wage execution may issue.

It is true that Dean had a legal right to argue that his salary was exempt. The resulting publicity, however, concerning a judge who issues court orders, but who refuses to pay when subject to such an order and leaves his creditors without a remedy because he is a state official, was hurtful. The damage to the public confidence in the judiciary came about because of this adverse publicity. I agree with the council's censure only because that result should have been apparent if good judgment had been exercised. However unintended the harm may be, we must uphold public confidence in the judicial system.

It is unfortunate that Dean, who had a very long record of honorable service, and who was caught up in an impossible financial situation, took the course he did. The majority upholds the council's censure on the ground that Dean wilfully and intentionally failed to make the court-ordered instalment payments. It was not disputed, however, that, at the time, Dean had no

---

[1] Section 52-356d is entitled "Instalment payment order."

assets and had debts of $700,000. His bankruptcy soon followed. Furthermore, the statutory scheme for instalment orders exists primarily for the benefit of debtors. Only under the statute that provided the sole remedy of a wage execution for default could instalment payments be ordered. See *Hartford Bank & Trust Co.* v. *Dansky*, 17 Conn. Sup. 295, 296 (1951) (*King, J.*). Where, as the majority holds, Dean's failure to pay the instalment order is the basis for censure, I agree with Justice Berdon that Dean should be given an opportunity to pay the instalments to avoid censure. In the case cited by the majority, in which a judge failed to comply with a court order, the judge was given a further opportunity to comply. *In re Kading*, 74 Wis. 2d 405, 410, 246 N.W.2d 903 (1976).

Accordingly, although I agree that censure was appropriate, I would join Justice Berdon in giving Judge Dean the opportunity to pay the seven instalment payments forthwith to avoid censure.

BERDON, J., dissenting. Let me first state what this case is not about. The conduct of the respondent, Judge Harold H. Dean, as specifically found by the judicial review council (review council), "did not affect his judicial duties or responsibilities" in any way. Indeed, there is no claim by the review council that Judge Dean ever did anything illegal or immoral during the time period investigated by the review council or at any time during his many years on the bench. What he did do in attempting to resolve his substantial financial problems, which resulted from real estate development ventures that he invested in during the 1980s, was the subject of a great deal of media coverage in which he was severely criticized. The media criticism resulted after the trial court determined that Judge Dean's wages were exempt from garnishment, as were the wages of all public officials, for public policy reasons, based upon

a decision of this court.[1] Our judicial process, however, is not driven by the editorial pages of the newspapers. Rather, Judge Dean is entitled to due process of law like any other citizen.

As the majority recognizes at the beginning of its opinion, our standard of review of the findings and legal conclusions of the review council with respect to its determination that Judge Dean violated one or more of the canons of the Code of Judicial Conduct (code), and of its decision as to the appropriate sanction, is not deferential. *In re Flanagan*, 240 Conn. 157, 165, 690 A.2d 865, cert. denied, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997). The standard of review places upon us a "nondelegable responsibility, [on] appeal, to undertake a scrupulous and searching examination of the record to ascertain whether there was substantial evidence to support the council's factual findings. . . . *In re Zoarski*, 227 Conn. 784, 789–90, 632 A.2d 114 (1993); *Council on Probate Judicial Conduct re: James H. Kinsella*, 193 Conn. 180, 192, 476 A.2d 1041 (1984). As to the review council's ultimate legal conclusion that the facts found support a finding of a violation of one or more of the canons of the [code] . . . our review

[1] In *Prudential Mortgage & Investment Co.* v. *New Britain*, 123 Conn. 390, 195 A. 609 (1937), this court decided that the salaries of state officials are not subject to garnishment "for the reason that 'the salary of a public officer is a provision made by law for his maintenance and support during his term' " and as such is not property for garnishment purposes; id., 393; and because "interference by garnishee process with the [official's] discharge of his duty constitutes in effect an interference with the state's sovereign functions . . . [that] should not be permitted without definite direction from the legislature." Id., 394. In 1997, after the events in this case had already occurred, the legislature amended General Statutes § 52-361a, which provides for wage executions, by adding subsection (k), which provides: "Notwithstanding any provision of law, the remedy provided by this section shall be available to any judgment creditor and the status of the defendant as an elected or appointed official of any branch of the government of this state may not be interposed as a defense." See Public Acts 1997, No. 97-132, § 8.

[is] de novo." (Internal quotation marks omitted.) *In re Flanagan,* supra, 165. Although the majority, at the outset, acknowledges this constitutionally mandated standard of review, it somehow loses sight of it in its analysis, as I shall point out in this dissent.

It is helpful to start with the undisputed facts. Judge Dean has been a prominent and highly respected member of the judiciary for more than twenty-nine years and is presently the senior jurist on the Superior Court. During the 1980s, Judge Dean was invited to participate financially in a series of real estate developments by an acquaintance, Michael Piazza, who operated as the principal operating person for the ventures. Judge Dean's role was solely as an investor, and involved his signing, along with Piazza and, in some instances, a third investor, promissory notes that were given to the banks that financed the real estate ventures. In all, Judge Dean signed notes in excess of $1 million, for which his liability was both joint and several. In 1986, the adoption of a revised federal tax code effected important changes with respect to real estate investment, precipitating a significant depression in the real estate market. The four banks that provided the major source of financing for the real estate ventures in which Judge Dean had invested—Mechanics and Farmers, BankMart, Norwalk Savings Bank and Fairfield First— all failed. The real estate ventures also failed. In addition, in 1991, Piazza was forced into involuntary bankruptcy and, subsequently, his obligations on the promissory notes signed by himself, Judge Dean, and, in some cases, the third investor, were discharged. Consequently, Judge Dean became solely liable for the full amount of the notes that he and Piazza had signed as original obligors.

Following Piazza's discharge in bankruptcy, Judge Dean attempted to effectuate a settlement with all of his creditors regarding the notes, but was unsuccessful.

Subsequently, the banks began to file actions against Judge Dean on the notes, and Judge Dean, having no defenses to the notes, allowed default judgments to enter against him. He contacted his attorney, Richard D. Zeisler, regarding filing for bankruptcy, although he was hesitant to do so, because he still believed that there was a possibility that he could resolve his financial obligations with his creditors without resorting to bankruptcy, and he was concerned about the stigma attached to persons who file for bankruptcy. In the meantime, the assets of BankMart, the original holder of the note at issue in this case, were taken over by the Federal Deposit Insurance Corporation (FDIC). DAP Financial Management Company (DAP Financial) purchased from the FDIC the note on which Judge Dean was liable, receiving an assignment of BankMart's right to collect on it.[2] In 1994, DAP Financial filed an action against Judge Dean on the note, and obtained a default judgment of $129,500 against him. At the time the default judgment entered, a periodic payment order of $15 per week was also ordered. Although not required to do so, Judge Dean sent DAP Financial a check for $780, an amount equivalent to the entire first year of payments in advance.

Shortly after DAP Financial received that payment from Judge Dean, it filed a motion seeking an increase in the amount of the periodic payment order. In August, 1996, the trial court, after a hearing, ordered an increase in the weekly payment from $15 to $250. Judge Dean made no further payments toward the periodic order at that time because: (1) he was anxious to bring about a final resolution to his financial problems in their

---

[2] Judge G. Sarsfield Ford, the dissenting member of the review council who would have absolved Judge Dean in this matter, stated in his separate opinion that "Attorney Richard Zeisler testified [before the review council] that no more than '10 to 12 cents on the dollar' was the consideration paid [by DAP Financial for the note] for, what he termed, the Vulture Trade."

entirety and was concerned about paying substantial amounts to only one of his creditors toward only one of his debts; and (2) he was advised by his attorney that he was not required to do so because the payment order had no coercive consequences. He again contacted his attorney in contemplation of filing for bankruptcy. Before a decision was made with regard to bankruptcy, however, DAP Financial, in October, 1996, filed a motion seeking to have Judge Dean's wages garnished in the amount of $700 per week. The trial court, based upon an earlier decision of this court, held that Judge Dean's wages were exempt from garnishment.[3] Immediately thereafter, articles began to appear in the press that were highly inflammatory and prejudicial to Judge Dean, leading to the impression that there had been serious impropriety on his part. As a result of the adverse publicity, Judge Dean commenced making the $250 per week payments and continued to make such payments until he filed for bankruptcy. Subsequently, and also as a consequence of the publicity, the review council, upon its own motion, initiated these proceedings against Judge Dean. The creditor, DAP Financial, never filed a complaint with the review council against Judge Dean. Eventually, the review council determined that, in all, after allowing for the credit of the $780 initially paid by Judge Dean, the total number of weekly payments missed by Judge Dean was seven.

Although Judge Dean, at one time, may have had substantial assets, most of those assets were lost or sold at a loss as a result of his ill-fated investments even prior to the time that his coinvestor, Piazza, was discharged in bankruptcy. There is no claim by any of Judge Dean's creditors that he is capable of ever paying his substantial debts. Furthermore, there is no allegation in this case that Judge Dean was anything but a

---

[3] See footnote 1 of this dissent.

prudent investor with respect to the real estate development ventures, or that his debt arose as a result of anything but pure misfortune. Canon 5 (c) (2) of the code specifically provides that "a judge may hold and manage investments, including real estate, and engage in other remunerative activity including the operation of a business." Finally, there is no allegation in this case that Judge Dean intended to do anything but resolve his financial problems in a legal and morally acceptable manner.

The review council recognized that neither Judge Dean's decision to invest in the real estate development ventures, nor his status as a defendant in the civil action against him for damages as a result of the failure to pay a promissory note executed in connection with that venture, nor his failure to pay the civil judgment entered by the court against him based on that promissory note, nor his eventual petition for relief from indebtedness under federal bankruptcy laws, constituted a violation of the code. Rather, the conduct that the review council found violated canons 1 and 2 (a) of the code was the failure to pay, for a period of approximately seven weeks, an instalment payment order made pursuant to General Statutes § 52-356d. For the following reasons, I disagree that such conduct constitutes a violation of the code so as to subject Judge Dean to public censure.

First, the comprehensive statutory scheme governing postjudgment collection procedures; c. 906, General Statutes §§ 52-350a through 52-400f; does not intend that instalment payment orders made pursuant to § 52-356d be coercive in nature. Rather, instalment payment orders are specifically designated by the statute as noncoercive orders. Section 52-356d (d) provides: "An instalment payment order shall not be enforced by contempt proceedings, but on the judgment debtor's default on payments thereon, the judgment creditor may apply for a wage execution pursuant to section 52-361a." In

other words, the only consequence for failure to abide by such an order is the possible garnishment of the debtor's wages. This provision stands in marked contrast to several of the other provisions contained in chapter 906, which specifically provide that the failure to comply with those provisions may subject the person to whom the order applies to contempt of court proceedings, a fine, damages, or other penalty. See General Statutes § 52-351b (c) (failure to comply with discovery orders may subject person to contempt of court); General Statutes § 52-356b (d) (failure to comply with turnover order may subject person to contempt of court); General Statutes § 52-397 (failure to comply with order for examination of judgment debtor may subject him to fine, damages and capias); General Statutes § 52-399 (failure to comply with order for examination subjects debtor to contempt of court); General Statutes § 52-400b (failure to comply with certain other orders may subject person to contempt of court).

The overall statutory scheme contemplates that when a judgment creditor selects an instalment payment order as its method of enforcing a judgment, and the judgment debtor fails to make payments under the non-coercive payment order, the judgment creditor must pursue another approach to enforcement. General Statutes § 52-361a (a) provides for wage garnishment as an alternate method of enforcing the judgment. In this case, at the time when Judge Dean ceased making periodic payments to DAP Financial, garnishment could not be obtained against Judge Dean or against other governmental officials because the wages of such officials were made exempt from garnishment as a result of a decision of this court based upon public policy.[4] The fact that Judge Dean's wages were exempt from garnishment, however, did not operate so as to alter the method of operation of either § 52-356d or the overall

---

[4] See footnote 1 of this dissent.

statutory scheme. In other words, it remained the case that an instalment payment order under § 52-356d was still a noncoercive order, even with respect to a government official such as Judge Dean.[5]

Indeed, two legal experts testified before the review council that the order of payment entered pursuant to § 52-356d was not coercive but, rather, was designed for the protection of debtors like Judge Dean. Robert A. Slavitt, an attorney practicing for more than forty years and specializing in creditors rights, who represented the original lender, BankMart, at the time of Judge Dean's default, testified in the language of laypersons[6] as follows: "This statute [§ 52-356d] is essentially a judgment debtor protection device. If you go back, the statute really assumed its current form toward the end of the depression. . . . At that time, people who couldn't pay their bills could literally be put in jail. You've heard other witnesses talk about contempt, and you can be put in jail for contempt today if you don't pay child support or things like that. But in the [1930s], you could be put in jail if you didn't pay a judgment debt. And [as a result] all across the country . . . these types of debtor-protection statutes came into being.

"The scheme . . . is . . . that the creditor is entitled to some protection. . . . Now, the debtor has a choice: pay the amount which the court said you're able to pay or lose the protections which this statute has given to you. And the protections you lose are: your bank account can be garnished, your salary can be garnished, other assets which are not exempt under

[5] It is not disputed that, were Judge Dean not a judge, he would have been free to choose not to pay the instalment payment order pursuant to § 52-356d without being subjected to any sort of penalty whatsoever, other than that his creditor would then acquire the right to pursue other remedies under chapter 906 of the General Statutes.

[6] Slavitt was requested to testify in nonlegalistic language because of the members of the review council who were not lawyers.

other statutes can be taken away from you and sold at public auction to pay the debt. Your real estate can be foreclosed. All of these things can happen to you if you don't pay the amount which the court has found you're able to pay.

"If the intent of [§ 52-365d] was to allow the creditor to enforce that order, the statute would not say it cannot be enforced by contempt, because that's the easiest way to enforce the order. You don't pay, go to jail. That's what contempt does. The statute clearly is not designed for that. It's not designed to require the debtor to pay.

"It's designed to protect the debtor by saying to him, 'You've had a chance to let a court decide what you can afford. If you pay that, this creditor cannot come bother you again forever. If the debt is $1 million and the court finds you can pay $100 a week, you can live for the next 85 years giving him $100 a week. That debt will never get paid, and [the creditor] can't do anything else to collect it.

"That's what the statute is designed to do and nothing else. It is a debtor-protection statute with enough provisions in it so that the debtor can't turn around and abuse the creditor with the protection he just received."

Zeisler, an attorney who had practiced for more than thirty years and also had specialized in creditor's rights and who represented Judge Dean, confirmed the foregoing testimony of Slavitt.

In light of the noncoercive nature of an instalment payment order under § 52-365d, I do not agree that the failure to make periodic instalment payments constitutes a violation of canons 1 and 2 (a) of the code. Further, I fail to understand the rationale behind the review council's conclusion that the failure to pay the order violated those canons. The review council found

that the failure to pay the civil judgment upon which the instalment order was based did not support a finding of probable cause to believe that there had been a violation of canons 1 and 2 (a). It is illogical, therefore, to conclude that the failure to pay the noncoercive instalment order pertaining to that same judgment constitutes a violation of those canons.

Second, although Judge Dean intentionally did not make the seven weekly instalment payments, there is not a scintilla of evidence that he intended to violate the code. Indeed, he was acting on the good faith belief, based upon the advice of counsel, that he was not required to pay the instalment order. Judge Dean testified as to the reasons for his nonpayment as follows: "One, I couldn't afford it. Number two, Mr. Zeisler, who is an expert in creditor's rights, informed me that it was not an order and not to be concerned. Number three, Mr. Zeisler indicated [that the payments would constitute a preference in bankruptcy], and he assumed that I was going to file for bankruptcy, and [that DAP Financial would be required to return the payments to the bankruptcy estate] any way."[7]

Third, there is not a case in this state and, indeed, not a case in any jurisdiction in this nation that has

[7] Zeisler testified regarding the legal advice that he gave to Judge Dean as follows: "I said to [Judge Dean] that I did not feel that it was an enforceable order, nor that it was even an order in the sense of ordering; that it was a finding on the court's part telling him that he could afford $250.

* * *

"I stated to him that in the event he paid the $250 within ninety days of bankruptcy, it could be a preference. I also told him that I felt by making payments to one creditor, he was inviting an involuntary bankruptcy, because when one creditor gets information [that] another is being paid, the other creditors essentially become jealous, and that usually leads to bankruptcy . . . . [Furthermore, o]nce the wage execution was pending, I felt that the finding, the $250, no longer existed; that at this point, the only order that the court had that was outstanding was the order that his wages be garnished . . . . I said, 'I don't think there's an order at this point. I think there's a wage execution.'"

come to my attention, in which a judge's failure to pay an instalment order with respect to a civil judgment has resulted in a violation of a Code of Judicial Conduct. The cases relied upon by the majority are inapposite to this case. Those cases indicate that a judge's conduct must implicate him or her in some sort of wrongdoing in order to provide a basis for disciplinary action. In *In the Matter of Glancey*, 515 Pa. 201, 527 A.2d 997 (1987), it was the refusal by the judges involved to provide certain financial information required by law that resulted in their being warned that they would be subject to sanctions if they continued to refuse to provide the information. The judges' refusal to file the required disclosure statements was based upon their assertion of their fifth amendment constitutional privilege against compulsory self-incrimination with respect to criminal matters. Id., 217–18. In *In the Matter of Judicial Disciplinary Proceedings Against Staege*, 165 Wis. 2d 21, 24, 476 N.W.2d 876 (1991), a judge was found to have violated a section of the Code of Judicial Ethics that prohibited judges from indulging in "gross personal misconduct" as a result of the fact that he was twice found to be in contempt of court for refusing to remedy a situation on his property that was in violation of the county zoning ordinance. In *In re Kading*, 74 Wis. 2d 405, 246 N.W.2d 903 (1976), a judge was sanctioned for repeatedly refusing to file a financial report with the state judicial commission as required by the Code of Judicial Ethics. The judge argued that the requirement that judges file financial disclosure statements was unconstitutionally overbroad, improper and violative of due process of law. The court determined, however, that the requirement was valid, and gave the judge an extension of time in which to comply. Id., 407. The judge's continuing refusal to do so was properly determined to provide a basis for sanction. In *In the Matter of Williams*, 701 A.2d 825 (Del. Jud. 1997), a judge was

publicly censured and suspended for three months for failing timely to pay withholding taxes for his law firm's employee payroll, for failing timely to pay property taxes, and for failing timely to pay approximately twenty-nine outstanding parking tickets, some of which were grossly delinquent. In these four cases, the conduct either violated a law or involved the failure to comply with a court order that carried with it a sanction for violation.

I agree that a judge should be held to a higher standard of conduct than the average person, and even a higher standard of conduct than the average professional person, in order to protect the integrity of the judiciary and the public confidence in that integrity. I also agree that a violation of the law is not necessary to find that a judge has created the appearance of impropriety or impugned the integrity of the judiciary so as to constitute a violation of canon 1 or canon 2 (a) of the code. When a judge is to be publicly censured, however, for personal conduct unrelated to the judge's official responsibilities, duties or office, I believe that the conduct that provides the basis for the censure must either (1) contain an element of bad faith, (2) be immoral in nature, or (3) otherwise reflect adversely upon the impartiality or integrity of the judiciary or the public perception of the impartiality or integrity of the judiciary.

For example, in *In the Matter of Dalessandro*, 483 Pa. 431, 457, 397 A.2d 743 (1979), the Supreme Court of Pennsylvania considered "very serious questions" regarding the extent to which a judge could be disciplined "for conduct in one's private life when that conduct has had no effect upon the individual's conduct of his [or her] judicial office, and is not prohibited by law." The court concluded that there was no basis for disciplining a married judge who carried on a lengthy affair with a married woman while in office because

the conduct involved was private, and neither adultery, fornication nor criminal conversation any longer were prohibited by law in Pennsylvania. Id., 462; see also *In re Kroger*, 167 Vt. 1, 702 A.2d 64 (1997) (judge who knowingly made false statements under oath at hearing of association of county judges was properly sanctioned because, although conduct was not illegal, judicial dishonesty threatens public confidence in integrity of judiciary); compare *In re Douglas*, 135 Vt. 585, 382 A.2d 215 (1977) (although no bad faith found on part of judge, sanctions still appropriate because conduct could be interpreted as in violation of statute; judge used, for personal expenses, funds in Probate Court account that had accumulated as result of discounts court received from local newspaper when placing legal notices concerning estates in probate).

In my view, the conduct in this case does not violate either canon 1 or canon 2 (a) of the code and does not support the imposition of any sanction. The conduct was completely unrelated to the exercise of Judge Dean's judicial duties, was not in violation of any law, did not contain an element of bad faith, was not immoral, and did not demonstrate disrespect for the law or the judiciary such as would tend to erode public confidence in the impartiality or integrity of the judiciary. To the contrary, Judge Dean acted under the good faith belief that his conduct was legal and otherwise appropriate.

Finally—and most importantly—even if the failure to pay an instalment order constitutes prohibited conduct under canons 1 and 2 (a), I disagree with the review council's decision to impose a sanction because I believe that the review council acted too hastily under the circumstances. In light of the fact that Judge Dean conducted himself under the reasonable, good faith belief that the failure to make instalment payments did not constitute a violation of canons 1 and 2 (a), and in

light of the fact that there is not one other reported case in this country in which such conduct has led to a judge's being sanctioned, the review council should have allowed Judge Dean the opportunity to make the seven payments missed once it had determined that, under the code, instalment payment orders are coercive orders with respect to judges, unlike other citizens. See *In the Matter of Glancey*, supra, 515 Pa. 201 (respondent judges given thirty days to provide financial information required by Code of Judicial Ethics that they refused to provide earlier by attempting to assert fifth amendment privilege not to testify); *In re Kading*, supra, 74 Wis. 2d 410 ("[judge] can avoid even at this late date the imposition of any sanction whatsoever by complying with Rule 17"; court afforded judge twenty days after date of decision to comply with order requiring him to file financial information that he previously had refused to disclose). Instead of blemishing the otherwise impeccable reputation earned by Judge Dean over his many years of service, common decency required that he be given the opportunity to remedy the situation before a sanction was imposed. In view of the foregoing and, in recognition of the fact that it is this court's ultimate responsibility to provide de novo review of the review council's actions and conclusions; see *In re Flanagan*, supra, 240 Conn. 167; at the very least, I would remand this matter to the review council with direction to afford Judge Dean the opportunity to comply with the instalment payment order to the extent that he was found delinquent. If the order is complied with, no sanction should be imposed and the matter should be dismissed.

The majority, in footnote 21 of its opinion, decides that this court should not afford Judge Dean the opportunity to comply with the order by allowing him to pay the seven missed weekly instalment payments because: (1) that issue is "not before the court"; (2) Judge Dean

"never sought such relief"; and (3) "throughout the proceedings, [he has] taken a position denying the code violation." These arguments are simply incredible. The issue is, of course, before this court. We made it clear in *In re Flanagan,* supra, 240 Conn. 167—and the majority apparently now forgets that it acknowledged this fact at the beginning of its opinion—that judicial discipline must be reviewed de novo by this court. Indeed, such review is constitutionally mandated. It makes no difference that Judge Dean did not seek such relief. In the very cases that the majority relies upon, the judge first was given the opportunity to comply in matters that were more important to the integrity of the judiciary than the payment of seven instalments of money to a creditor who did not initiate these proceedings. Finally, Judge Dean obviously did not contest the matters merely to save seven weekly instalment payments, but, rather, did so on the basis of principle. The cost to Judge Dean resulting from these proceedings is obviously far greater than the sum of the seven $250 instalment payments.

Accordingly, I dissent.